## L. & N. R. R. Co. v. Greenwell's Admr.

(Decided October 13, 1911.)

### Appeal from Bullitt Circuit Court.

1. **Master and Servant—Negligence.**—Before the injured servant can recover damages from his master, he must show that his injury was caused by some neglect of the master, or by some other servant of the master, which is imputed to him.

2. **Negligence in Operating Trains.**—The ordinary jerking and bumping which always accompanies the switching of freight cars within the yards of the company does not, of itself, constitute negligence on the part of the company.

3. **Master and Servant—Assumption of Risk.**—Those who accept employment as switchmen and brakemen and whose duty requires them to be on and about the cars, are fully advised as to the risks incident to their employment, which they must assume if they accept to take part in that employment.

CHARLES CARROLL & BENJAMIN D. WARFIELD for appellant.

CHAPEZE & CRAWFORD for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

This action was brought by the administrator of Thomas Greenwell, a switchman in the employ of the

Louisville & Nashville Railroad Company, against that corporation, to recover damages for the death of said Greenwell, which was alleged to have been brought about by the negligent operation of the appellant's train. Greenwell fell from the top of the front car of a train of about 36 cars that was being pushed into switch No. 4, and was killed. This is the second appeal of this case, the opinion upon the first appeal being reported in 125 S. W., 1054. Upon the second trial appellee was given a verdict for $10,000, and from a judgment thereon the defendant appeals, and contends that its motion for a peremptory instruction should have been sustained

After a careful review of the evidence upon the first appeal, and the law applicable thereunder, we concluded that opinion with these words:

"Applying the principles announced in the foregoing cases to the facts brought out in evidence by the plaintiff, it is apparent that the defendant company was not shown to have been guilty of any actionable negligence whatever and the trial court should have peremptorily instructed the jury to find for the defendant."

In support of that conclusion we quoted and relied upon the following extract from Hurt v. L. & N. R. R. Co., 116 Ky., 545, which may be very properly repeated here, and should be held in mind upon this consideration of the case:

"Before the injured servant can recover damages from his master, he must show that his injury was caused by some neglect of the master, or by some other servant of the master, which is imputed to him. It is not enough to show merely that the plaintiff sustained his injury while in the service of the master. Where the circumstances attending the injury show nothing as to the real cause, but leave it to conjecture whether it was the negligence of the master, the fault of the injured servant, or an unaccountable accident, there is a failure of proof."

Three witnesses testified for the appellee upon the first trial—the boy Elmo LeGrand, the only eye witness to the accident, Steve McDaniel, a switchman, who was a member of the crew to which Greenwell belonged, and Charles Martin. Martin did not testify upon the second trial, and Elmo LeGrand retracted all of the material part of his former evidence, by admitting that he had not seen Greenwell fall from the car. Appellee, however,

introduced a new witness, E. M. Hamburg, who is, upon this trial, the only eye witness to the accident; and, in order that we may give the fullest effect to his testimony, which, under the former opinion, is to be treated as decisive of this case, we quote the material part of it, as follows:

"Q. Just describe to the jury, Mr. Hamburg, all the facts in regard to that accident as you saw them?"

"A. Well, I was coming from some street in there— I believe it is called Oakdale Terrace—coming eastward towards the depot. I was on my way to Highland Park; and when I was coming to the depot I noticed a train backing southward and a fellow standing on the front end of the car. Just as I got to the corner where the street comes to the depot, the train seemed to make a sudden stop, and by some means—I don't know just how —jerked the cars, and this fellow dropped off. There was a train between me and him—I couldn't tell whether he hit the ground, or where; I knew he left the top end of the car."

"Q. What was the man doing, or seeming to be doing, at the time, if anything?"

"A. He was standing on the end of the car—seemed to be down on a step on the end of the car."

"Q. What do you mean by step, Mr. Hamburg? Do you mean a step used by a brakeman?"

"A. Yes, sir. The brake is on the end of the car sitting down where you have to get down on a step to set the brake.

"Q. And he was on that step?"

"A. Standing on the step."

"Q. Did he or not have his hands on the brake?"

"A. Well, he was stooped over; I couldn't see. I didn't pay any attention to that."

"Q. Mr. Hamburg. what was the nature of this sudden stop in regard to violence? Describe it."

"A. The train checked all at once, you know."

"Q. Was it accompanied with much or little noise, Mr. Hamburg—the stopping of the train?"

"A. Oh, it made a right smart noise."

"Q. Judging from the way this noise sounded to you, where you were standing, at what distance, in your judgment, could this noise of the crash of those cars have been heard?"

"A. Why, it could be easily heard, I suppose something like four or five squares, some thing like that."

"Q. It was, then, a very loud noise?"

"A. Yes, it was a loud noise."

"Q. Did you observe how many cars were being backed there at that time?"

"A. No, sir; a string of them, that's all; I don't know how many."

"Q. A string of them—is that what you said?"

"A. Yes, sir."

"Q. Was it a long string of cars, or not?"

"A. Yes, sir, seemed to be a very long string."

"Q. Could you see the end of the cut of cars, the engine, from where you were—or did you see it?"

"A. No, sir; never saw no engine."

Hamburg further testified that he attempted to go into the railroad yard to learn what had happened to the man that he had seen fall from the end of the car, but that he was stopped by some one—presumably one of appellant's watchmen, who told him that it would be dangerous to go in the yard. Hamburg further testified that there was a rule of the company which required 50 per cent. of the cars moved in the yards to be equipped with air brakes; but he could produce no such rule. Furthermore, it appears from the uncontradicted testimony of Cody, the appellant's General Yard Master, that the rule by its terms, did not apply to switching operations in the yards, and that it was wholly impracticable to use air brakes in switching work.

By comparing this testimony of Hamburg with the testimony of Elmo LeGrand as narrated in the former opinion in this case, it will be seen that Hamburg's testimony is no stronger for the appellee than was the testimony of LeGrand upon the former trial.

The testimony of the switchman, McDaniel, is substantially the same now as it was then. Joseph Holt, a switchman who was working in the yards with a different crew from Greenwell, did not see the accident, but was near the north end of the cut of cars as they were being pushed in on switch 4. The cut of cars contained about 36 freight cars, and was being pushed by two engines along the main track and thence on to switch track 4. When the engines had reached a point about seven or eight car lengths from the entrance to switch 4, the assisting engine was cut loose and returned in the

opposite direction. Holt's opinion as to the effect upon the train caused by the cutting loose of the assisting engine may be seen from the following extracts from his testimony:

"Q. What effect, if any, would the cutting loose of that front engine have upon the cut of cars as to stopping it, or giving a sudden and unusual, severe jerk?"

"A. It would cause a terrible jerk and jar. Where two engines had been shoving a cut of cars, and one being cut off so sudden, it would naturally cause the slack to run out and come back to the rear end where Greenwell was riding; in other words, it would be like the cars getting from under his feet—the cars would slack back and get from under his feet."

"Q. Would it be an unusual and unnecessary jerk, Mr. Holt?"

"A. Yes, sir."

"Q. Would that be a necessary jerk, or an unnecessary jerk, taking everything into consideration? I mean in running that cut of cars back, would it be necessary to give that train that jerk?"

"A. No, sir; not if the engines stood together, coupled together—they could have shoved the cars in without causing any jerk when they did it."

Holt further testified that he heard no unusual noise, and saw no unusual jerk, and all that he heard was a bumping noise made by the cars.

Appellee also introduced Ellis A. Williams, who testified as an expert only. The effect of his testimony was, that when two engines move a cut of cars, and one engine is cut off, it would produce a slack in the cars and a consequent jerk of considerable force.

Jackson, the engineer in charge of the engine which was pushing the cut of cars, was introduced by appellee, and testified that there was no unusual jar or jerk of the cars when the assisting engine was detached, and that he did not know when it left his engine. To be explicit, we give his own language, as follows:

"Q. When the other engine left yours, did it make a jar or a jerk?"

"A. Not a bit. I didn't know that he had left me, as I said—I didn't miss him until I looked back and saw he had separated from me."

"Q. From the time you started that cut of cars from the revenue track until you had put them in on track No.

4, was there at any time any unusual jar or jerk of those cars in any way?"

"A. No, sir; there was not."

In this he is supported by Kotheimer, his fireman, who testified upon this point as follows:

"Q. Did your engine, the engine upon which Mr. Jackson was engineer, stop after the first engine pulled loose, and before you got the cut of cars in the clear?"

"A. No, sir."

"Q. Didn't stop at all?"

"A. It only stopped when we got into No. 4 track."

"Q. I say it didn't stop before you got in the clear?"

"A. No, sir."

Jackson further says, and in this he is supported by practically all of the witnesses, that the cars were not going faster than four miles an hour. None of the witnesses except Hamburg put the speed of the train greater than six miles per hour; while Hamburg, who had no experience with railroad operations, says it was running something like ten or twelve miles an hour.

Furthermore, Ream, the engineer of the assisting engine, and Kotheimer, the fireman of the pushing engine, agree that the assisting engine was cut loose from the pushing engine at a point about fifteen car lengths from the opening of switch 4. But, since the distance from the opening of switch 4 was only about eight car lengths further to the point where Greenwell fell from the car, we would have a full distance of only 23 cars between the point where the engine was detached and the point where Greenwell fell from the car. The train, however, had not less than 35 cars. It would appear, therefore, that Greenwell fell from the car before the assisting engine was detached, and while the two engines were at a point more than 500 feet distant from the point where the assisting engine was detached.

From this brief review of the testimony, it will be seen that the case on this appeal stands substantially as it stood on the first appeal, with the testimony of Hamburg as to the accident substituted for the testimony of LeGrand. In our opinion Hamburg's testimony is no stronger for the appellee than LeGrand's testimony.

The evidence shows no negligence upon the part of the appellant, unless the ordinary jerking and bumping which always accompanies the moving and switching of freight cars while being switched within the yards,

should be treated as negligence. But, it must be admitted by everyone of ordinary experience in such matters, that there is, and must always be, more or less jerking and bumping in the handling of cars, and that they cannot be handled so as to avoid it.

In its controlling facts, this case is singularly like the case of Yates v. The Miller's Creek Construction Co., 28 Ky. Law Rep., 331, which was cited and relied upon in the former opinion. In that case it was contended that the company was liable because of the alleged negligence of an engineer in suddenly and violently starting or increasing the speed of the train, whereby the plaintiff was thrown from the tender on which he was riding and injured. In holding there was no negligence on the part of the company, this court said:

"The fact that there was a sudden and even hard jerk of the tenders by the engine does not prove that the engineer or fireman was negligent. The only witness professing to know what caused the jerk was Cotton, and he explained that it was caused by the opening of the throttle. Not being an expert he was unable to tell whether the opening of the throttle was or not at the time necessary. All he could say about it was 'the jerking was caused by the throttle being opened starting the train again. I do not know how wide the same was opened, but it started the train with a jerk.'

"The proof wholly failed to show that the jerk which threw appellant from the tender was not such as usually attends the movements of such a train, or that it was of unusual force, or was caused by an unnecessary force applied to the train through the engine or in the manner of operating it."

And, in Groves v. L. & N. R. R. Co., 29 Ky. Law Rep., 725, we held that the mere fact that a train stopped suddenly did not furnish any evidence, or create any presumption of negligence on the part of the engineer, since it may have been his imperative duty to stop it when and as it was stopped. It is impossible, by reason of the very nature of the business, to handle a heavy train of cars without more or less jerking and bumping. The railroad business cannot be successfully conducted without it; and those who accept employment as switchmen and brakemen, and whose duty requires them to be on and about the cars, are fully advised as to the risks incident to their employment, which they must assume if they ex-

pect to take part in that employment.  L. & N. R. R. Co. v. Fox, 20 Ky. Law Rep., 81.

Being of opinion that the case upon this appeal is no stronger for the appellee than it was upon the former appeal when we said a peremptory instruction should have been given for appellant, it follows that the judgment must be reversed for further proceedings.

Judge Nunn dissenting.