## CHESAPEAKE & O. RY. CO. v. THOMASON.
### No. 6369.

Circuit Court of Appeals, Sixth Circuit.
May 11, 1934.

J. R. Bush, of Lexington, Ky. (W. B. White, of Mt. Sterling, Ky., and Hunt & Bush, of Lexington, Ky., on the brief), for appellant.

Robert H. Winn, of Mt. Sterling, Ky. (R. G. Kern, of Mt. Sterling, Ky., and Wallace Muir, of Lexington, Ky., on the brief), for appellee.

Before HICKS, HICKENLOOPER, and SIMONS, Circuit Judges.

HICKS, Circuit Judge.

Action under section 820b-1, Kentucky Statutes,[1] by Artie S. Thomason, administratrix of the estate of Andrew B. Thomason, against Chesapeake & Ohio Railway Company, a Virginia corporation, to recover damages for his death. Judgment for plaintiff. Defendant appeals.

In 1930 appellant operated a branch line railroad from Mt. Sterling to Rothwell, both in Kentucky. On November 4th, about 10 o'clock a. m., a mixed train consisting of two empty box cars and a combination baggage and passenger coach, pulled by an engine running with the tender in front, left Mt. Sterling for Rothwell, which was east, in charge of Bailey, conductor, with Jones as engineer, Broom, fireman, and Smith and Thomason, brakemen.

About 605 feet west of Cedar Grove, an intermediate station, a spur track, beside which some cross-ties had been piled for ship-

---

[1] "§ 820b-1. *Railroads Liable for Injury or Death of Employees Due to Negligence.*—That every common carrier by railroad while engaged in commerce in this state shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or in case of the death of such employee, to his or her personal representative for such injury or death to such employee resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence in its cars, engines, appliances, machinery, track, roadbed, docks, boats, wharves or other equipment. (1918, c. 52, p. 153, § 1.)"

ment in the two box cars, branched from the north side of the main line. Just west of the switch to the spur, the coach was cut off, and the engine, proceeding, diverted the cars to the spur by means of a "flying switch." The cars stopped short of where the ties were stacked, and the engine backed up and then followed them on to the spur to shove them forward. As the coupling was made, Thomason, who was riding the two cars, was knocked or fell from his position on the forward end of the front car and was run over by it and the front wheels of the second car and was killed.

Appellant challenges the denial of a directed verdict, and the question is whether there was substantial evidence that Thomason's death was caused by unnecessary and excessive force in making the coupling.

Nancy Spencer, witness for appellee, living by herself about 186 feet from the switch, testified that, when the train came in and stopped, she was standing in her door. She described the movement of the train until the engine backed up and started in on the spur; explained that because it was a cold morning she then went back in the house, fastened the door, and sat down by the fire, and while sitting there she "heard a mighty hard bump"; that she had been living there 38 years. She was asked:

"Q. Had you seen and heard them coupling cars? A. Yes, sir.

"Q. Do you know the sound that the coupling of cars makes? * * * A. Yes, sir, I do.

"Q. I will ask you upon that occasion what did that bump sound like? * * * A. It was just a hard sound is all I can tell —it was just a hard bump; I call it—a hard bump. * * *

"Q. How did that bump upon that occasion compare in loudness or in sound with bumps that you had heard upon other occasions there for thirty years? * * * A. It was a terrible hard bump.

"Q. My question was how did it compare upon that occasion with bumps you had heard before? A. It was just loud, is all I can tell you—it was just a loud bump. * * * It was a lot harder than when I had heard it before."

Floyd Lawson, witness for appellee, testified that he was hauling corn about 400 yards from the place of the accident; that he heard the coupling; that it was a very loud noise; that it just sounded like cars coupling together; that he had worked on bridges for the railroad for about four months and had lived around a railroad all his life; and that he was familiar with the sound that comes from coupling cars.

Mrs. Boyd Spencer, witness for appellee, testified that she lived on the opposite side of the railroad from Mrs. Nan Spencer; that she and her son were sawing wood a little way from the house; that she saw the engine cut in on the switch and heard a big bump.

"Q. What did that bump sound like to you? A. It sounded awfully hard.

"Q. I mean did it sound like anything, is there anything that you could tell it sounded like? A. No, it just sounded awfully hard.

"Q. What was that bump? * * * A. It was just a bump, is all I know about it.

"Q. You say you had been living there about three years? A. Yes, sir.

"Q. Hadn't you ever seen them or heard them coupling cars before? A. Yes, sir.

"Q. How did that bump that you heard compare with the coupling of cars, the noise that you heard? * * * A. Hard. * * *"

"The Court: Had you heard any coupling of cars bumping one against another before? A. Yes, sir.

"Q. At that place? A. Yes, sir.

"The Court: Q. And it seemed harder than what you had heard? A. Yes, sir."

Opal Cobb, witness for appellee, eleven years old, the daughter of O. P. Cobb, who owned a store at the station, testified that she had been watching trains during the two years her father had lived there; that she had seen cars coupled and uncoupled; that on the day of the accident she was standing in the living quarters upstairs over the store with her sisters; that she saw the train coming from Mt. Sterling. She was asked:

"Q. Now on this occasion did you hear anything that attracted your attention or anything out of the ordinary? A. Yes, sir. When I heard the bump, when the train started to bump I turned my head so I couldn't see the bump.

"Q. Why did you turn your head? * * * A. I was afraid to see. I turned my head to keep from seeing it bump. * * *

"Q. Did you hear any coupling together there at that time, hear any noise of the cars coupling together, or running together? A. Yes, sir."

Questions by the court:

"Q. Did you hear some noise? A. Yes, sir.

"Q. Describe that noise. A. Well it seemed pretty hard to me."

On cross-examination she testified: "I have seen other cars up there coupled together. They always make a noise, and some of them a pretty loud noise."

Ruth Cobb, witness for appellee, fourteen years old and a sister of Opal, testified that she was upstairs with the other children and heard the coupling.

"Q. What was it you heard? A. A loud crashing noise.

"Q. What did it sound like? A. Sounded like a loud noise to me.

"Q. Had you ever during the time you had lived there watched the switching of trains and the switching in of cars there? A. Yes, sir. I had watched this train switch the cars and some of the other trains switch.

"Q. Just this particular train on different days before that you mean? A. Yes, sir.

"Q. Did you ever hear the noise of cars being coupled and uncoupled in this train before? * * * A. Yes, sir.

"Q. How did the loud noise that you heard on this particular day compare with the coupling noise that you had heard on former days? * * * A. It was louder, to me."

Boyd Spencer, witness for appellee, saw the coupling from the platform of the store; and testified that when it "bumped" he thought the engine bounced back and did not make the coupling, but on cross-examination stated that the noise was such as was usually made when an engine and cars came together, and that he was not certain that the engine failed to couple.

Neither of these witnesses except Boyd Spencer claim to have seen the engine run against the cars with unnecessary speed or excessive violence, and upon that feature Spencer's testimony is limited to what he "thought" had occurred. The case, therefore, as aptly stated by the District Judge, "is purely a noise case."

Appellee proceeds upon the theory that the harder the impact the louder the noise therefrom, and that, because there was evidence that the noise of the coupling was louder than that incident to couplings made on previous occasions, it must follow that the force used was unnecessary and excessive. This is an effort to establish a fact from the existence of another fact, or, in other words, is a pure inference, and has at least two weaknesses:

First, it is not shown that couplings, previously heard and used as a basis of comparison, were carefully and properly made. The noise varies with each coupling, and many elements in addition to sound enter into the question of due care. To determine that question by noise alone, disregarding all other essential features, is to produce a result too uncertain to be safely made the basis of comparison. See U. S. v. Ross, 92 U. S. 281, 283, 23 L. Ed. 707; Cunard S. S. Co. v. Kelley, 126 F. 610, 616 (C. C. A. 2).

Second, the deduction insisted upon by appellee rests upon the mere opinions or conclusions of witnesses who were altogether inexperienced in the art of railroading. See Louisville & N. R. Co. v. Greenwell's Adm'r (Ky.) 125 S. W. 1054, and the report of the second trial of the same case in 144 Ky. 796, 799, 139 S. W. 934.

But we need not determine whether the inference relied upon has sufficient substance to be submitted to a jury because we think it is destroyed by credible and substantial evidence of what actually happened.

Brakeman Smith, witness for appellee, testified that when the engine hit the cars it was running very slowly, probably about two miles an hour, and had almost stopped; that he gave the engineer the usual slow-up and steady signals by barely moving his hand, and that, after the coupling was made, he gave the pick-up signal; that the jolt when the coupling was made was no more than usual—that it was just the usual coupling with the usual noise from it.

The engineer testified that he was going about four miles per hour as he backed into the spur; that, when the brakeman gave him the steady signal, he applied the brake and slowed down to about two miles per hour; that the impact with the box car was very slight; that the engine went about three or four feet after it hit the car, and came to a stop; that the noise of the coupling was very slight, about what it usually is when a coupling is properly made; that in making the coupling he was going both by the signals and his own judgment.

The fireman testified that as the engine backed down on the spur it was going probably a mile or a mile and a half an hour—very slowly; that the contact was just the normal one so far as he could remember; that he did not think the noise was anything out of the ordinary; that it was just the ordinary coupling.

The conductor testified that as the engine approached the cars it was running something like four or five miles an hour; that the brakeman gave the steady signal, and at the time the car was coupled or the contact made he did not think that the speed of the engine could have been more than one or two miles

an hour; that he heard the coupling; and that it sounded just like an ordinary coupling.

In view of the direct testimony of these witnesses, we think that the evidence upon which appellee relied "lost its substantial character if any it had" [see Strider v. Penn. R. Co., 60 F.(2d) 237, 239 (C. C. A. 6); American Oil Co. v. Frederick, 47 F.(2d) 54, 56 (C. C. A. 6)], and that the coupling was made essentially as appellee's expert, Hall, testified that it should be made; i. e., that "the proper way for an engine to couple up to two cars or more or any cut of cars should be to come up under precaution, very slow, not hardly proceeding, but just barely proceeding, to couple up; that is, under precaution to keep from breaking the draw-bars or any damage to the car or anything." We are of the opinion, therefore, that the case should be ruled by Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 341, 53 S. Ct. 391, 77 L. Ed. 819; Gulf, etc., R. Co. v. Wells, 275 U. S. 455, 459, 48 S. Ct. 151, 72 L. Ed. 370; and Southern R. Co. v. Walters, 284 U. S. 190, 194, 52 S. Ct. 58, 76 L. Ed. 239.

We are not permitted to indulge in inferences and presumptions in the face of ascertained and established facts [Toledo, St. L. & W. R. Co. v. Howe, 191 F. 776, 783 (C. C. A. 6)], and, when the inferences disappear, there is no substantial evidence that Thomason's death was caused by the negligence of appellant or its employees. Further, in the language of Judge Hickenlooper in Grand Trunk Western R. Co. v. Holstein, 67 F.(2d) 780, 783 (C. C. A. 6): "We think that this was a proper case for application of the doctrine that a verdict should be directed for defendant whenever the evidence is such that if a verdict were returned for the plaintiff the court should, in the exercise of a sound discretion, set it aside."

Appellant urges upon us that it was entitled to a directed verdict upon the ground that the law applicable to the case was the Federal Employers' Liability Act (45 USCA §§ 51–59) instead of the Kentucky Statutes, § 820b-1, but the District Judge instructed the jury upon the theory that the Kentucky statute applied. There was no exception to this feature of the charge and no request to instruct otherwise. The point, therefore, presents no reviewable question.

The judgment of the District Court is reversed and the case remanded for a new trial.[2]

---

[2] The late Judge HICKENLOOPER concurred in the conclusion reached but died before the opinion was prepared.