## STARR v. SUPERHEATER CO.
### No. 6722.

Circuit Court of Appeals, Seventh Circuit.
March 2, 1939.

Frederick C. Crumpacker, of Hammond, Ind., and Jesse W. McAtee, Charles M. Reed, and Lester F. Murphy, all of East Chicago, Ind., for appellant.

William L. Travis, of Hammond, Ind., for appellee.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

By this action appellee sought to recover damages for breach of alleged oral contract for life employment. The case was tried before a court and jury and it resulted in a judgment on the verdict for $26,000 in favor of appellee. From this judgment the appeal is taken, and the errors relied on arise out of the failure to grant appellant's motion for a directed

verdict and the overruling of its motion for a new trial.

Appellant is a Delaware corporation and maintains a plant in the city of East Chicago, Indiana, where it manufactures superheater equipment for locomotives, and stationary and marine boilers.

Appellee worked as erection and utility engineer for appellant from September, 1918, to July, 1922, with his headquarters in the East. In March, 1921, he sustained personal injuries when he fell from a ladder of a steamship in the dock at New York. At that time he was engaged in supervising the installation of superheater equipment on ships at Tebo Yacht Basin Company, under the direction of appellant for whom he was working at the time of his injury. In March, 1922, he filed a civil action in the State Court of New York against the United States Shipping Board and the Tebo Yacht Basin Company for damages because of that injury. Later, and before 1924, he filed action against appellant before the Industrial Board of New York for compensation growing out of his injuries. In the first case he recovered a judgment on April 2, 1923, for $3,270.71, which very shortly afterwards he settled for $2,800. Before he received this money he filed a reservation of his compensation claim against appellant. In the second action evidence was heard by the Industrial Board on January 4, 1924, and on November 5, 1924, the Board rendered a decision adverse to appellee.

Most of the controverted facts in this case involve two conversations on May 15, 1924, in the company's New York office. One was between appellee and one Schaff, a vice-president of appellant, and the other between appellee and True, a vice-president, who was the chief executive officer in charge of appellant's plant at East Chicago.

In order to understand the relationship between these parties at the time the alleged contract was made, it is necessary to consider the facts immediately following the injury. The opinion promulgated by the Industrial Board with its decision of November 5, 1924, recites that after the injury on March 2, 1921, appellee resumed his regular employment with appellant on June 1, 1921, and that on July 1, 1922, appellant requested that he resign his position because he refused to discontinue his action against the Tebo Yacht Basin Company. Following his discharge in 1922, appellee sought employment at different places including appellant's New York office during the spring of 1924, and as late as May 1, 1924, he called on appellant's vice-presidents Ryder and Oatley, who told him that they had nothing to offer him. About May 1, he called on Schaff and asked him if he would not intercede to get him employment. Schaff replied that he would speak to True, the manager of the East Chicago plant, who was expected in New York early in the week of May 15. On that same day Ryder handed Schaff a letter from the chairman of the New York Industrial Board in which the writer interceded in appellee's behalf, stating that he was in bad straits. It was a very human and appealing letter. When True arrived in New York about May 12, Schaff showed him this letter, and True stated that he would see whether he had something for Starr at East Chicago; that later he would be in conversation with his shop superintendent, but in any event he would like to see Starr. Thereupon, Schaff telegraphed Starr to come to the offices, and Starr arrived at Schaff's office shortly thereafter apparently in response to the telegram.

From this time on the conversation between Starr, Schaff and True is quite controverted. Starr's version of these conversations is substantially as follows: Schaff said, "You know why I called you up here, don't you?" Starr said he did not, and Schaff replied, "I called you up here to see if we could not straighten matters out." Starr responded, "Well, just what do you mean, straighten matters out? I don't quite get what you mean. I have been away from the Company now for pretty near two years and I don't know what you want to straighten out." Schaff said, "Well, you know we have been hearing a lot about you since you had this suit with the Industrial Board and with the Shipping Board, it is getting to a point where we have got to do something about it." Starr then inquired of Schaff what he meant. Schaff replied, "We want to put you back to work." Starr asked where they wanted to put him to work and Schaff said they wanted him to go to East Chicago, to which Starr demurred, whereupon Schaff told him he would have to go there if he wanted to be re-employed. Starr then said that he would go, expressing a friendly attitude toward the company, and inquiring what was the propo-

sition and the consideration. Schaff replied that the consideration would be $200 a month. Starr replied, "You mean to tell me that you are going to take me back now and have me stay with the Company for the rest of my life?" Schaff replied, "Yes. That is just what I mean." Starr stated, "Well, I would like to have that put in writing. I would like to have you put that on paper so there won't be any question about it afterwards." Schaff replied, "We can do that. Mr. True will be in the office. He will have a talk with you about going out to East Chicago because he has got to go out to East Chicago first and take matters up there first as to where they are going to place you. So Mr. True will take care of that end of it."

True was then in another room of the office and Schaff told Starr to go into that room and that True would take care of him. Thereupon Starr went into True's room and according to Starr's version the following conversation was had: Starr told True that Schaff had sent him. True said, "You will go out to East Chicago, and I will have to go on first to get the matter taken up with the shop superintendent to see where he is going to place you, and I think you will go in the Inspection department." True further said that he would write Starr a letter informing him when to appear at East Chicago, and that he would wire him as to the exact time, and remarked that he was glad to see him with them again. He stated,

"You won't have to worry much now because we will take care of you. Of course you know we expect you to withdraw that appeal of the Industrial Board in consideration for this." To which Starr replied that he would do that. True then said, "You will be taken care of the rest of your time. You won't have to worry about anything." When Starr said that he would take care of the appeal before the Industrial Board, True said for him not to bother with it that they (meaning the company) would take care of it. On account of this statement Starr said he left it with them to dismiss the claim and that this was the reason he did not write to his attorneys telling them to do it.

On this same day before True left New York, he wrote a letter to Starr[1] and on May 20, after True had returned to East Chicago, he sent a telegram[2] to Starr directing him to come. Both of these messages were received by Starr. Up to that time Starr denies ever having solicited the appellant for re-employment, except that he either wrote a letter to Oatley, its engineer, with reference to employment, or mentioned that subject to him while on a train. On the day following the alleged conversations between Starr, Schaff and True, Starr wrote a letter to the chairman of the Industrial Board informing him, among other things, of his re-instatement. The contents of that letter are not in this record except as it is described by the Chairman in his reply[3] to Starr, which is dated May 20, 1924.

[1] New York, May 15, 1924.

Mr. A. Starr,
2577 Hughes Street,
Glendale, L. I.

My Dear Mr. Starr:

In accordance with our understanding, I am offering you a position in our shop inspection staff at a salary of $200.00 a month.

I enclose check for $150.00—$50.00 of which is intended to cover your traveling expenses to East Chicago. The balance, $100.00 is considered an advance upon your salary, which you may repay at your convenience.

I suggest that you come out to East Chicago upon receipt of telegram which I shall despatch from East Chicago on Monday or Tuesday next. When you have had opportunity to find suitable living quarters, you will doubtless desire to bring Mrs. Starr. We shall be glad to

pay her transportation and the cost of your moving from Brooklyn at that time.

Yours very truly,
(Signed) Charles H. True,
Vice-President.

[2] A. Starr
2577 Hughes St. Glendale NY
We shall expect you Thursday
(Signed) C H True

[3] New York Office, May 20th, 1924.

Mr. Adolph Starr,
2577 Hughes Street,
Glendale, N. Y.

Dear Mr. Starr:

I have yours of the 16th and note your pleasure at having been reinstated with the Superheater Company.

I beg to advise that under date of the 16th, I have a response to my letter to them advising me that they had taken you on and assigned you to work at Chicago.

I am very glad indeed for you that this matter has turned out in this way and I

Schaff denied he had stated to Starr that the company would employ him for life, or as long as he wanted to work, if he would withdraw his appeal or dismiss his claim pending before the Industrial Board. He further stated that he never had a conversation with Starr in which any reference was made by him or Starr to the fact that a claim had been filed against the company. True said that there was nothing said to him by Starr about his claim then pending against the company for compensation; that there was nothing said between them about the employment of Starr for life, or permanently, or as long as he desired to remain with the company. He further denied that he stated to Starr in substance or in fact that he or the company would take care of the dismissal of Starr's pending claim.

Starr's employment by appellant was terminated July 1, 1931, by a letter, disclosing no reason therefor except depressed conditions. Starr thereupon went to see True and inquired why he was discharged. He said that True told him that business was bad and the company had to let him go; that he replied, "Mr. True, you know you are under obligations to me for a life job. I understood it was for a life job, to be here with the company for all time," and that True replied, "Well we cannot help that. We just have to let you out. And another thing I got my orders from New York. I am not alone in this."

■ Whether the jury's verdict is supported by substantial evidence must be determined by this court. The jury had a right to believe the testimony of Starr, provided it was substantial, although it was disputed by other witnesses. The support of the verdict and the judgment depends almost entirely upon Starr's testimony and it cannot be successfully denied that it is quite inconsistent in several respects. In the first place, in his direct examination he said that the consideration for the contract for life employment was that he should withdraw his appeal of the claim for compensation. He said this occurred on May 15, 1924. At that time there was no appeal pending and it was almost seven months before the judgment was rendered by the Industrial Board. Again, he said that he was quite anxious on the day of the conversations referred to to have the agreement for life employment in writing, and yet within five days of that time he received and accepted True's letter as the basis of their agreement, in which there was not one word said about life or permanent employment. On the next day after the conversations with Schaff and True, he was so well pleased with his re-employment that he wrote to the chairman of the Industrial Board, who apparently was kindly disposed to him, informing him of such re-employment, and said nothing about the continuity of that employment.

■ The contents of that letter are not in the record, but from the reply to it on May 20, we think it clearly inferable that Starr in his letter had inquired with respect to the date of determination of his claim, when we consider his testimony hereinafter referred to, that he with his attorney had laid out a plan before he left New York for deferring the final disposition of his claim, in order to protect him against the cessation of his employment by appellant. The further fact that he informed the chairman of the Board of his re-employment, saying nothing of its continuity, clearly indicates to us that he was merely attempting to execute that plan. True, appellee denied that he made such inquiry, and he later denied that he had talked with his New York attorneys concerning his claim, but his several statements are so inconsistent that they can neither be reconciled nor cast aside.

If appellee made an agreement in good faith to dismiss his claim in order to secure the contract of life employment, we cannot conceive any reason why on the following day, when he wrote the letter to the chairman of the Board, he did not dismiss his claim, because the doing of that act was the only consideration upon which his life employment depended.

am sure that you will use every endeavor to serve them in a way to merit continued relations with them.

Regarding the determination of your compensation case, I beg to advise that we are still awaiting the transcription of the minutes of the later hearings and until such hearings are received, your case cannot receive attention. As soon after receipt of the minutes, as consistent with other demands upon us, we will decide your case.

I hope you have every success in your new position.

Yours very truly,
　　(Signed)　John D. Higgins,
　　　　　Chairman Industrial Board

Moreover, he took no steps to dispose of the claim for almost seven months thereafter, and even then it was not disposed of on his motion but by the order of the Board adversely to him on the merits, the concluding part of which is set forth in the margin.[4] Furthermore, we find that an appeal was taken from this order about a month later and it was not withdrawn until the expiration of almost another month. Starr said the appeal was taken without his knowledge by his former attorneys, who had represented him in his case against the Tebo Yacht Basin Company but that he was never represented by attorneys in presenting his claim before the Industrial Board. He further stated that when he first learned of the appeal he immediately instructed those attorneys to withdraw it and drop the whole case, which was done on January 1, 1925. After stating that he did not talk to his attorneys before he left New York and that he did not authorize them to give notice of the appeal from the Industrial Board, he testified that he talked the whole matter over with one of them in New York and laid out a plan by which the notice of appeal was to be given to protect him in seeing that appellant kept him in its employ. It is true that he was not represented by attorneys before the Industrial Board before his claim was disallowed, but his statements with respect to his relationship after that time with his former attorneys who took the appeal is so contradictory that his evidence in this respect could not well be considered as substantial.

The defense upon which he principally relies for not dismissing the claim or the appeal is the fact that True told him that he or the company would attend to that. Of course, neither True nor his company could have dismissed either the claim or the appeal without authority of Starr, and it is passing strange, if this was the agreement, that authority to dismiss this claim was not secured from Starr on the date of the alleged conversations or that some reference was not made to it in the letter that was written by True

on that date. Especially is this true when the agreement to dismiss was the only consideration moving to appellant for its agreement to continue his employment for life.

As bearing upon the reason for appellant to enter into the contract which appellee claims, it is proper to consider the position in which appellant was placed at the time of such re-employment. At that time appellee's claim for compensation was pending under sections 29 and 32 of the Workmen's Compensation Law of New York, McKinney's Consolidated Laws of New York, Annotated, c. 67, book 64, pages 159, 160 and 165, and it is conceded that the maximum recovery under that law was $3500. Starr had already recovered a judgment against the Tebo Yacht Basin for $3207.07 which he afterward settled for $2800. Under the sections just referred to, the greatest amount which Starr could have recovered from appellant was $292.29. Section 29, last referred to, provides: "A compromise of any such cause of action [against a third person] by the employee or his dependents at an amount less than the compensation provided for by this chapter shall be made only with the written approval of the commissioner, if the deficiency of compensation would be payable from the state insurance fund, and otherwise with the written approval of the person, association, corporation, or insurance carrier liable to pay the same."

This section was construed in O'Brien v. Lodi, 246 N.Y. 46, 157 N.E. 925, in answer to a question certified by the Appellate Division, 218 App.Div. 837, 219 N.Y.S. 873, to the New York Court of Appeals. The question was whether, if the insured employee compromised his action against a third party without the consent of the Commissioner or insurance carrier, such compromise would thereafter be set aside to enable the employee to claim deficiency compensation under the law if his recovery were less than the compensation. The court said that it would not. This record does not disclose that appellee's judgment against the Tebo

---

[4] "After reviewing all the evidence, I am unable to find that this claimant was disabled in any way since July 1, 1922, from performing his regular employment. His decreased earnings have been due to the fact that he has been unable to obtain employment in his usual occupation because of conditions in such industry. The amount recovered by him from the third party, in my opinion, has adequately compensated him for all disability resulting from his injury. His claim for compensation must, therefore, be denied."

Yacht Basin Company was compromised with the consent of the Commissioner or the insurance carrier. Hence, it would seem under the New York rule that at the time the alleged contract was entered into, there was no liability on the part of appellant.

It is further conceded that appellant was fully insured with respect to this injury, and its insurance carrier was defending the action for appellant. Starr's expectancy of life at the time the contract was entered into was 20.21 years, hence the amount of liability assumed by appellant under the alleged life contract exceeded $48,000. To say that there was any impelling reason to cause appellant to propose life employment in order to escape any kind of liability is not supported by this record.

However, if we consider that the avoidance of liability for $700 or $292.29 can be considered as a valid consideration for the execution of the alleged contract, the fact remains that appellee did not perform his part of the contract. The obligation assumed by appellant under the alleged contract rested upon the benefit appellant would receive through the dismissal of the claim. Appellee not only did not comply with this provision but requested and received the decision of his claim before the Industrial Board, which made it impossible for him ever to comply with his part of the contract, and the subsequent dismissal of his appeal could not be considered as a performance of what he agreed to do. In a contract where there is an executory consideration, the execution of the consideration is usually a condition precedent to liability on the promise, and the failure to execute the consideration discharges the promisor.

Furthermore, the conduct of the parties to a contract will be looked to in determining the meaning then attached to it, and we think the conduct of the parties here involved undeniably disclosed that neither of them considered nor believed that they had entered into a contract of life employment. McKell v. Chesapeake & O. Ry. Co., 6 Cir., 175 F. 321, 20 Ann. Cas. 1097; Sattler v. Hallock, 160 N.Y. 291, 54 N.E. 667, 46 L.R.A. 679, 73 Am. St.Rep. 686; Woolsey v. Funke, 121 N.Y. 87, 24 N.E. 191; City of Vincennes v. Citizens' Gas Co., 132 Ind. 114, 31 N.E. 573, 16 L.R.A. 485.

In Scudder v. Union National Bank, 91 U.S. 406, 23 L.Ed. 245, the Supreme Court laid down the following rule with reference to the law governing contracts in cases in which the place of making and the place of performance are not the same: (1) Matters bearing upon the execution, interpretation, and validity are determined by the law of the place where the contract is made; (2) matters connected with the performance are regulated by the law of the place where the contract is to be performed; (3) matters relating to the remedy depend upon the law of the forum. In the State of New York where this contract was made, an oral contract of permanent or life employment made by a corporation through its vice-president is insufficient in law and is unenforceable without authorization or ratification by its board of directors. Heaman v. E. N. Rowell Co., 261 N.Y. 229, 185 N.E. 83; Carney v. New York Life Ins. Co., 162 N.Y. 453, 57 N.E. 78, 49 L.R.A. 471, 76 Am.St.Rep. 347. The court in the Heaman case used language very pertinent to the case at bar.[5]

---

5 "Alleged contracts for life employment are, however, so unusual as to have been, with rare exceptions, condemned by the courts as unreasonable and unauthorized. The president or other executive officer of a corporation has no authority as such to make a contract that one should remain in the corporate employ for life even under a general power 'to appoint, remove and fix the compensation of employees.' That any board of directors or other persons responsible for the management of a corporation should give such unusual power to an executive officer cannot be implied. Plain language of the managing board, clearly showing that such was the intention of the corporation, coupled with power actually or impliedly vested in the corporation itself, must be found to justify such a hiring. [Citing Carney v. New York Life Ins. Co., 162 N.Y. 453, 57 N.E. 78, 49 L.R.A. 471, 76 Am.St.Rep. 347, and other cases.]

* * *

"The complaint does not suggest that the board of trustees of the defendant corporation ever authorized or ratified the contract set forth in the complaint. Plaintiff rests entirely on the affirmative allegation that the contract was made 'through the president.' If the plaintiff proved the facts alleged and nothing more he would fail to establish a cause of action. He would establish an unauthorized contract of hiring, not enforceable against the corporation." [261 N.Y. 229, 185 N. E. 84.]

The case at bar proceeds on the theory that the alleged contract was made with appellant's vice-presidents Schaff and True, and the complaint does not allege that there was a ratification. The case was tried on the theory that Schaff and True had the power to bind the corporation without authority from the Board and this is clearly indicated by the court's instructions.[6]

Appellee, however, relies on Usher v. New York Central & H. R. R. Co., 76 App.Div. 422, 78 N.Y.S. 508; Pennsylvania Co. v. Dolan, 6 Ind.App 109, 32 N. E. 802, 51 Am.St.Rep. 289, and kindred cases, in which it is held that an employer who by his promise of life employment to an employee injured in the service has induced the employee to forego his right to recover damages, is estopped to deny the authority of the officer or agent who made the promise. These holdings are based upon the equity rule that an employer cannot retain the advantage or benefit arising from the promise and at the same time deny the authority of the agent who made it. Application of this rule would scarcely be denied in any jurisdiction because it is based upon sound elements of estoppel. In this case, however, the necessary facts to create an estoppel are not present. Here appellee was not induced to release his claim or to give up anything of value or to act to his disadvantage in any way by reason of any promise or inducement of appellant or its agents. If appellee did promise to do any of these things, it is clear that he did not perform his agreement and of course appellant received no benefit or advantage by reason of such promise. After having failed to perform his contractual obligation, he cannot enforce the performance of that contract by the other party. Warren v. Stoddart, 105 U.S. 224, 26 L.Ed. 1117; Jones v. United States, 96 U.S. 24, 24 L.Ed. 644; Skehan v. Rummel, 124 Ind. 347, 24 N.E. 1089. The consideration under such circumstances must be considered as having failed. Weed v. Centre R. Co., C.C., 138 F. 474; Jones v. Hathaway, 77 Ind. 14; Jeffries v. Lamb, 73 Ind. 202.

We have not attempted to set forth all of the contradictory statements of appellee with respect to the establishment of his alleged contract and the alleged agreement with True to dismiss appellee's claim before the Industrial Board, or his appeal after the judgment was rendered. To do so would unduly extend this opinion. It is sufficient to say that we regard his evidence as similar testimony was regarded in the case of Ewing v. Goode, C.C., 78 F. 442, 444. The court there said: "When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither." We think appellee placed the court in a position where it could not safely rely upon his testimony, and for this reason we cannot regard it as substantial. In Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720, the Court said: "A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The decisions establish a more reasonable rule 'that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.' "

A perusal of this record convinces us that the court should have sustained appellant's motion for a directed verdict (Pennsylvania R. R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819), and that under the court's instruction above referred to there was at least an abuse of discretion in not granting appellant's motion for a new trial.

The judgment is reversed and the cause is remanded to the District Court with instructions to grant appellant a new trial.

---

[6] The plaintiff charges, and has tried this case on the theory, that he had such a contract and that that contract was made in May, 1924, in conversations had with two executives of the defendant company, a Mr. Schaff and Mr. True. The plaintiff, as I say, adopted that theory, has tried his case on that theory, and must recover if he recovers at all on that theory. He can not recover on the theory that the company has ratified this contract if it was made. If there was a contract of that nature then there was a contract which he is entitled to recover on. In other words, what I am saying to you is that there is no doctrine of ratification involved in this suit.