## NATIONAL LABOR RELATIONS BOARD v. ASHEVILLE HOSIERY CO.

No. 4515.

Circuit Court of Appeals, Fourth Circuit.

Dec. 15, 1939.

Alvin J. Rockwell, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Samuel Edes and William F. Guffey, Jr., Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Thomas J. Harkins, of Asheville, N. C. (Harkins, Van Winkle & Walton, of Asheville, N. C., on the brief), for respondent.

Before SOPER and NORTHCOTT, Circuit Judges, and LUMPKIN, District Judge.

SOPER, Circuit Judge.

National Labor Relations Board seeks enforcement of an order whereby it directed Asheville Hosiery Company to cease and desist from discouraging membership in American Federation of Hosiery Workers, an affiliate of the Congress for Industrial Organizations, and to offer reinstatement to certain employees and to make them whole for any loss of wages suffered by their discharge or expulsion from the company's mill in the manner hereinafter described. The order was issued after hearing upon certain charges filed by the Union.

The Hosiery Company is a Delaware corporation, engaged in the manufacture and sale of hosiery at Asheville, North Caro-

lina, where it employs approximately two hundred and twenty workers. A larger percentage of the raw materials used in the manufacture are ·purchased outside North Carolina, and shipped into the State, and a large percentage of the finished products are shipped in interstate commerce to points outside the State. The application of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and the jurisdiction of the National Labor Relations Board are not disputed. Nearly all of the stock of the corporation is owned by Theo. Y. Rodgers, only one per cent being held partly by his son, John T. Rodgers, treasurer and general manager of the company, and partly by an attorney of the company. The relationship between the Rodgers and their employees has been close and intimate; and the controversies which are the subject of this suit were not occasioned by dissatisfaction on the part of the employees with their working conditions.[1]

These controversies began with the discharge of George Baxter from the company's employ on November 22, 1937. The Board found and now contends that Baxter was discharged for Union activities. In the middle of October, Baxter received a telegram that his mother was sick at Greensboro, North Carolina, and borrowed money from the company in order that he might visit her. While there, he visited the offices of the Union and became acquainted with its organizers; and as a consequence, an organizer came to Asheville on Sunday, November 14, and a meeting was held at Baxter's home. During the following week there was some solicitation of the employees to become members of the Union, but it was purposely kept secret from the management. On Saturdays the plant is not operated, but certain employees go to the mill to put their machines in order for the piece work operations of the following week. On Saturday, November 21, Baxter and others solicited workers at the plant to join the Union. During the afternoon the night foreman came to the plant. He denied any knowledge of the solicitation, and there is no direct evidence that it reached the ear of the management.

On the afternoon of Sunday, November 21, a score of workers and an organizer met at the home of Fulton Silvers, a fellow employee, and formed a tentative Union organization, by the election of a committee of five to take charge until permanent officers should be chosen. Edward A. Taylor was chosen spokesman for the committee. On Monday, November 22, at the close of the day's work, Baxter was discharged.

The Board found from this sequence of events that Baxter was discharged for Union activities. In order to reach this conclusion it was necessary to reject, as unworthy of belief, the testimony of John T. Rodgers and of others that Baxter was discharged for poor workmanship and inattention to his duties. The poor work record of the man was established by convincing testimony of which the Board had the following, amongst other things, to say in its opinion: "At the hearing it (the company) introduced records comparing the work of Baxter with that of seven other employees. These records show clearly that Baxter was the poorest of the eight and had been for some time. Other figures show Baxter to have made the poorest record of all the leggers for the week preceding his discharge. In addition, considerable testimony was introduced to show that Baxter was negligent and careless in his work and had been guilty of misconduct of various kinds, including gambling and drinking".

■ The Board supported its rejection of Rodgers' testimony as to the cause of the discharge by also finding that Rodgers' testimony was untrue when he said that at the time he had not heard of the recent tentative organization of the local branch of the Union or of Baxter's connection therewith. There was disputed hearsay testimony that Rodgers had heard of Baxter's contact with the Union upon the occasion of his visit to Greensboro;[2] and there was also disputed testimony that on Sunday, November 21, following the meeting at Silvers' house, Rodgers had heard of a movement to unionize the mill, although no mention of Baxter occurred in the testimony last referred to. But taken as a whole, the evidence adduced to show

---

[1] The workers were paid by the piece. The official shift was eight hours, but longer hours could be kept if desired by the employees. Some dissatisfaction with the long hours having reached Rodgers' ears, he announced in his speech of November 23 that thereafter the shifts would be restricted to eight hours.

[2] As to the unsubstantial character of such evidence, see Edison Co. v. National Labor Relations Board, 305 U.S. 197, 230, 59 S.Ct. 206, 217, 83 L.Ed. 126.

that the discharge was due to Baxter's connection with the Union rather than to his admittedly bad work was sufficient to give rise to nothing more than a conjecture or suspicion, and was too unsubstantial in law to support the Board's finding. See Edison Co. v. National Labor Relations Board, 305 U.S. 197, 238, 59 S.Ct. 206, 220, 83 L.Ed. 126.

Several subsequent events are also relied upon by the Board to indicate a discriminatory discharge. They give little confirmation to this theory unless one has already adopted it, but they require careful examination since they form the basis of additional findings upon which other provisions of the Board's order directed to the employer were grounded. Eleven Union employees were ejected from the plant on December 1 and 2 by the workers, who would not consent to their return to the mill until a week or more later; and four of the eleven employees left again on December 29 and have not yet returned for the reason, as they allege, that they were fearful of bodily harm. The Board held that the company was responsible for the consequent loss of employment of all of these workers on the ground that by its conduct it caused its employees to engage in the ousters and refused to offer the four men who left on December 29 unconditional reinstatement under a guarantee of protection. The company was therefore ordered to make good the loss of earnings, not only of nine of those who were out of work from the period December 1 to December 8, but also of the four who have not worked in the mill since December 29, 1937. A similar provision was made with regard to the earnings of George Baxter.

The events which led to the division of the workers into two factions, and the ejectment of some of the leaders of the minority Union group, were substantially as follows: The discharge of Baxter in the afternoon of November 22 led immediately to an accusation by the Union committee that he was discharged for Union activities. Rodgers angrily denied the accusation and warned Taylor, the spokesman of the Union committee, that he also might lose his job. The next day Rodgers apologized to Taylor for his hasty words. Previously, according to the testimony of numerous witnesses, Union members had been solicited upon the misrepresentation that a majority of the workers had signed Union cards, and upon the threat that when the Union came into power, non-members would lose their jobs. To some of the workers it was explained that if the management did not meet the demands of the Union when it was fully established, a strike would be called, the plant would be picketed and the non-Union men would not be allowed to enter. The largest Union membership at any time was forty-nine, of whom fourteen subsequently withdrew. The testimony of scores of witnesses as to the misrepresentations and threats of the active Union men is so circumstantial and detailed that it is impossible to disregard it in reaching a correct decision of the case.

During the afternoon of November 22 and the morning of November 23, there was considerable unrest among the workers as well as inattention to work. Rodgers made two speeches on the morning of November 23, one to the knitters and the other to the seamers and loopers, in order to quiet the unrest and dispel the confusion. These speeches were followed by a speech by Brewer, a foreman of the company on the following day. With regard to these speeches and the removal from the plant of coal and empty silk boxes, the Board had the following to say in its opinion:

"On Tuesday, November 23, John T. Rodgers spoke to the employees in assembly, in order, according to his own testimony, to dispel the confusion. He spoke about business conditions generally, saying that they were bad and that orders were dropping off. He pointed out to Ed Taylor that modern equipment in the plant had resulted in increased earnings for Taylor and for other employees. He stated that they had a perfect right to join a labor organization, but suggested that they think it over and not do anything hastily. He then intimated that his father disliked unions, and that there was a possibility that on his return he might shut the plant down when he learned about 'this trouble.' This speech of Rodgers was followed the next day by a speech by Brewer, also allegedly in an attempt to quiet the continued unrest among the employees. Brewer, in the same vein as the speech by Rodgers, emphasized that business was bad and competition keen. He pointed out also that new equipment in the plant had resulted in increased earnings for the employees, and told about antiquated equipment in Philadelphia. Brewer, in his testimony, denied, however, that he had in this speech, as testified by Taylor, blamed the unsatisfactory conditions in Philadelphia upon the success of union activities in that city. It is obvious,

however, that Brewer's speech had meaning for the employees only in relation to the setting in which it was made. It came upon the heels of a period of union organization and the discharge of the leading union member. As such, it could be understood only as a reiteration of Rodgers' covert threat to shut the plant down.

"Concurrently with these speeches, coal and empty silk spools were removed from the plant late at night. This added to the belief held by many of the employees that the plant was about to shut down because of the attempt to organize the employees into the Union. Although the explanation given by the respondent for the removal of the coal and silk spools may be satisfactory, Rodgers admitted that he knew of the impression it had caused among the employees, but despite that, did nothing to allay that impression or assure the employees that the plant was not on the point of shutting down." [3]

The excitement and confusion of the workers was not allayed by these circumstances. On the contrary, the feeling against the Union organizers on the part of the majority of the workers ran high. But the testimony taken most favorably to the Board's position does not justify the inference that the withdrawals from the Union were due to the attitude of the management of the mill. Of the fourteen members of the Union who withdrew from the organization, eight withdrew before Rodgers' speeches, and six of these withdrew before Baxter's discharge. Evidence of the most convincing kind shows that the misrepresentations and threats above referred to had stirred up violent resentment on the part of a majority of the workers against those who favored the Union.[4] A counter movement was inaugurated and a petition was circulated in the plant in which the signers pledged themselves "not to work with any member of the C. I. O. or any outside organization". On December 1 the workers drove eight Union men from the plant, including four members of the governing committee of the Union, and on December 2 the women in the looping and seaming room followed the example of the men and drove out three of their fellows. On the evening of December 1, after hours for the day shift, a crowd of workers assembled in front of the Langren Hotel in Asheville and some entered the hotel in search of the Union organizers with intent to force them to leave the city. A score of policemen arrived and at their request, Brewer, the mill foreman, who had reached the scene of the disturbance, addressed the crowd from the steps of the hotel saying that the captain of police had assured him that the organizers were about to leave town for the good of all, and that the police would tolerate no violence. The organizers were then escorted from the hotel by the police and the crowd dispersed.

During the subsequent week the ousted employees called upon Rodgers in groups and asked him to guarantee them protection so that they could return to work. Rodgers replied that that was more than he could possibly do but that he would speak to the men and endeavor to persuade them to permit the Union employees to return. On December 7 Rodgers called the employees together and addressed them in the following words:

"Dear Friends: I have called you together for the purpose of asking you to cooperate with the Company to the fullest extent, we would like to see the employees who you requested to leave return to work and to be given an opportunity to work with you peacefully in their regular jobs.

"These people have a legal right to work peacefully at their jobs without being mo-

---

[3] The basis for the statements in the last mentioned paragraph was the testimony of Taylor, spokesman for the Union, who said that he saw coal and silk boxes being removed from the mill during the night shift on November 30, and that wild rumors were floating around the mill that it was going to close. The rumors had no foundation in fact; and the removal of the articles was shown by uncontradicted evidence to have been merely incidental to the operation of the plant. Rodgers heard of the rumors a few days later, and on December 7, as appears below, he made a speech to the employees which clearly indicated that the plant was to be kept open.

[4] The Board refused to accept the testimony of numerous witnesses that they joined in the expulsion movement because of this resentment. It seems unreasonable to infer that the anti-Union employees were influenced by the unexplained removal of coal and silk boxes from the plant, and at the same time to hold that they were not moved at all by the admitted threats and misrepresentations of members of the Union faction.

lested by anyone. After all, we are all good Americans, and we cannot disrespect any of the laws of our country. We must live up to all laws.

"With the holidays coming on, I know that it will work a great hardship on these people if they were not gainfully employed, and I am sure that we will all feel better if we know that on Christmas Day that none amongst us in our group are in want. All of us make mistakes at times, and we should be tolerant of others who have done some things that do not entirely meet with your approval; and I am asking you now to make some expression by raising your hand, indicating your willingness to let these employees return to their jobs and work without being molested.

"I want to thank you for the fine spirit of loyalty which you have shown, and I hope that I will conduct myself to always warrant this friendly feeling and loyalty that you have shown for me; and if at any time I can be of any service to you, I hope that you will not hesitate to call upon me."

After the speech, the workers were requested to indicate, by holding up their hands, that they were willing to accede to the request of the management, and after four ineffectual attempts, they finally voted to allow the ousted employees to return. During the following week all of them did return. The hot feeling, however, did not immediately subside. Anti Union workers would not speak to the Union men and in some instances, failed to furnish proper cooperation in the work. The discussion led to one or two minor altercations in which Taylor, the spokesman and most militant of the Union members, figured prominently. He got into a fight with several workers outside the plant, and swore out a peace warrant, and finally on December 29, brought a tear gas pencil into the plant, claiming that he did so for his protection. When it was noticed, he was ordered by the manager to leave it outside, and complied with the order. At the end of the working day, upon leaving the plant in a car with three active Union members, a crowd of workers surrounded the car and threatened the occupants with violence. A woman worker interceded for them and they were allowed to depart, but were threatened with violence if they returned to work. A few days later they came to the office and got their pay, but said that they had not quit. However, acting on the advice of a Union organizer, they did not return. They made no complaint or request of the management at the time.

■ Upon this evidence, the Board has found that the company brought about the ousters and should pay the penalty. It is contended that the discharge of Baxter, the speeches of Rodgers and Brewer, and the impression created by Rodgers that the plant would close if the employees were organized into a Union, brought about the ejectment of the Union men. We are unable to give approval to this conclusion, for in our opinion the evidence, taken most favorably to the complainant, does not reasonably support it. There is no substantial ground for the rejection of the overwhelming evidence that the hostile attitude of the great majority of the workers toward the Union proceeded from their sincere and spontaneous dislike of outside interference; and it is not enough to say that the management shared this feeling and manifested it in the statements of its supervisory officials. There is no proof that these statements led or were intended to lead to the expulsion of Union workers. On the contrary, as we have seen, the nonunion workers were called together by Rodgers a few days after the ouster, and told that the Union members had the legal right to work at their jobs without molestation; and this action on the part of the management led to their return. No inference unfavorable to the management can reasonably be drawn from the fact that during the excitement then prevalent in the plant, the meeting was postponed until December 7, a few days after the ouster, or from the fact that the management undertook to prevent further violence, and to allay the resentment felt by a large majority of the employees, by persuasive methods rather than by disciplinary action. Nor is it reasonable to conclude that the Union workers would not have been expelled except for the attitude of the management, for such a conclusion would be based only on speculation or conjecture insufficient for a valid finding. In short, the complainant has not borne the burden of proof which the law imposes upon it.

■ Had the issue under discussion been a question for the decision of judge and jury in a trial at common law, the evidence would not have warranted its submission to the jury, and if nevertheless such an issue had been submitted, and had been followed by a verdict adverse to the employer, it would have been the duty of the judge to

set it aside and grant a new trial. This is a sound test when the probative force of evidence is to be ascertained, as the Supreme Court and the Circuit Courts of Appeals have repeatedly held, and it is the proper test to be applied to the findings of fact of an administrative tribunal, which are given finality by statute. See Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 343, 53 S.Ct. 391, 394, 77 L.Ed. 819; Edison Co. v. Labor Board, 305 U.S. 197, 229, 238, 59 S.Ct. 206, 216, 220, 83 L.Ed. 126; National Labor Board v. Sands Mfg. Co., 306 U.S. 332, 341, 342, 59 S.Ct. 508, 513, 83 L.Ed. 682; National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 958; Appalachian Electric Power Co. v. Labor Board, 4 Cir., 93 F.2d 985, 989.[5]

It follows, that the cease and desist provisions of the order of the Board contained in paragraphs 1 (a) and 1 (c) should be stricken out, whereby the employer is directed, in substance, to cease and desist from discouraging membership in American Federation of Hosiery Workers, or any other labor organization of its employees, by discharging or refusing to reemploy them; and from permitting physical violence or threats of physical violence to employees for the purpose of discouraging union membership or activity; and also that the affirmative provisions of the order contained in paragraphs 2 (a), 2 (b), 2 (c) and 2 (e) should be stricken out which in substance direct the employer to offer to Baxter and other Union employees reinstatement to the positions formerly held by them, and to make them whole for the wages they may have earned in the period subsequent to the termination of their employment, and to instruct the employees that physical violence on union employees will not be permitted in the plant.

We are of the opinion, however, that paragraphs 1 (b), 1 (d), 2 (d) and 2 (f) of the order should be retained, whereby the employer is ordered in substance to cease and desist from stating or intimating to its employees that in the event of unionization, the plant will be shut down or cease operations, and from in any manner interfering with, restraining or coercing its employees in the exercise of the right to self organization, to form or join labor organizations, and to bargain collectively through representatives of their own choosing, and the employer is directed to instruct the employees that successful or attempted Union organization will not lead to the closing of the plant, and to notify the Regional Director of its compliance with the order. Paragraph 2 (f) should be modified by striking out the reference to paragraph 2 (e) which is to be eliminated from the order.

These portions of the order should stand because it is a fair inference that the speech of Rodgers to the employees on November 23 was designed to influence the workers against Union membership through the statement that his father, who owned almost the entire stock of the corporation, disliked Unions and might shut down the plant when he returned to Asheville and learned of the Union movement. It was the undoubted right of the management to call the workers together and attempt to allay the unrest and to dispel the confusion existing on November 23, and to advise them that they had the right to join a labor organization; but it was an unwarranted interference with the efforts of some of the workers to form a local Union and, therefore, an unfair labor practice in violation of the National Labor Relations Act to suggest, that the mill might be closed if it were unionized. It is a fair inference from the evidence that the management had no intention of closing the plant. The Board has held that while a bona fide shut down of a plant does not constitute a violation of the Act, a shut down not made in good faith, and intended to discourage unionization is illegal. Matter of Sheba Ann Frocks, 5 N.L.R.B. 12, Matter of Somerset Shoe Co., 5 N.L.R.B. 486.

Our conclusion is that the order of the Board should be modified so as to conform to this opinion, and a judgment to this effect will be entered.

Modified and enforced.

---

[5] The ruling in Pennsylvania R. Co. v. Chamberlain, supra, has been followed in the following cases: Wardman v. Washington Loan & Trust Co., 67 App. D.C. 184, 90 F.2d 429, 431; Ferreyros v. Fox Theatres Corp., 63 App.D.C. 3, 68 F.2d 575, 576; Chesapeake & O. R. Co. v. Thomason, 6 Cir., 70 F.2d 860, 863; Starr v. Superheater Co., 7 Cir., 102 F.2d 170, 176; Adams v. Barron Collier, Inc., 8 Cir., 73 F.2d 975, 977; Chambers v. Skelly Oil Co., 10 Cir., 87 F.2d 853, 856; United States v. Ingalls, 10 Cir., 67 F.2d 593, 596.