JORDAN JACKSON *v.* ILLINOIS CENTRAL RAILROAD CO.

1. CONTRACTS. *Employment for life. Statute of frauds. Code* 1892, § 4225*d.*

A contract by a railroad company to give a designated person employment for the life of such person is not within the statute of frauds. since it may be fully performed within a year.

2. SAME. *Construction. Railroads. Public policy.*

In contracts for life employment the employer is not bound to retain in his service one who is unfaithful in performing his duties or incapable of so doing, nor is the employer bound in case he has no work which the employe can perform.　Such contracts, so interpreted, are not, when made by a railroad company, against public policy.

3. SAME. *Peremptory instruction.*

    In a suit against a railroad company for breach of an employment
    of plaintiff for life, if the evidence tends to show the making of
    the contract and the authority of the company's agent who ne-
    gotiated it to make the same, a peremptory instruction for defend-
    ant should not be given.

FROM the circuit court, first district, of Hinds county.

HON. J. B. CHRISMAN, Judge.

Jordan Jackson, the appellant, was the plaintiff in the court below; the Illinois Central Railroad Company, appellee, was defendant there. Appellant, Jackson, brought this suit in 1894 against the appellee for breach of a contract of employment for life, alleging that, having some eight years before lost a leg from being injured by a train of the railroad company, he was promised "a job for life" if he would not sue for damages for the injury. The railroad company denied the contract. Jackson was in the service of the company for several years, when he was discharged, as he says, without reasonable cause, but the railroad company pleads that he was discharged for good and sufficient cause. The court below gave a peremptory instruction and rendered judgment in favor of the railroad company. The plaintiff, Jackson, appealed to the supreme court. Other facts are stated in the opinion of the court.

*W. R. Harper*, for appellants.

It is clear from the reading of the testimony that all parties to the contract, if the testimony is to be believed, thought that there was a complete, binding contract, and plaintiff, in good faith, executed his part of the contract, and Turner, the super-intendent of the road, who made the contract, as long as he was in charge, carried out his part in good faith. Since Turner, as superintendent of the operating department, was a general agent of the company to employ men in that department, he was, in fact and in law, vested with full power to agree to all the terms of such contract, and especially the length of the term of service.

It is wholly immaterial whether Turner had the authority to make a contract of employment for life or not, for the contract sued on is not a contract of employment at all, but a contract in settlement of a personal injury, and the promise to employ for life was the consideration therefor. It cannot be questioned from the evidence that Head, the personal injury agent of the company, did arrange with Jackson to settle his claim against the railroad company by giving him a life employment. It is certain, too, that Head directed Jackson to the division superintendent to carry into effect such settlement, and it is certain from Turner's own statement that it was his habit and custom to give employment to men in settlement of personal injury claims against the railroad company, when directed by Head so to do. *Pacific Railroad Co.* v. *Thomas*, 19 Kan., 256; *Alabama, etc., Railroad Co.* v. *Hill*, 76 Ala., 303.

*Mayes & Harris*, for appellee.

The plaintiff himself and his sister, who was present when the alleged contract was made, state distinctly what occurred, and both state clearly that Turner not only did not make a contract with the plaintiff for life employment, but distinctly state that he informed them that such a contract must be made with the president of the road, and also show clearly that he (Turner) had no authority to make such a contract. The case, as made out by the plaintiff himself and his witnesses—Turner being one or them—shows, if anything, merely that the division superintendent of the railroad company was asked by him to make a contract for life with him, which the superintendent declined to do upon the ground that he did not have the authority, and that such a contract would have to be made with the president of the company.

Argued orally by *W. R. Harper*, for appellant, and by *J. B. Harris*, for appellee.

WOODS, C. J., delivered the opinion of the court.

That the appellant had a personal injury claim (whether good or bad we need not concern ourselves with), and was threatening suit against the railroad company, can hardly be said to be disputed. The only evidence having a semblance of contradiction is found in the deposition of Turner, the then division superintendent of the railroad company. But that is only to the effect that Turner now has no recollection of a threatened suit. This want of recollection on Turner's part is not in conflict with the other positive statements made by other witnesses. That the appellant was seen during his confinement to his house, after the amputation of his leg, necessitated by his injury, by the personal injury agent of the company, and was assured by him that the company would take care of him and give him a lifetime job, is not denied; that he told Jackson, then and there, that the division superintendent at New Orleans was the official he would have to see about the matter, and that a pass would be given him to New Orleans, that he might see that officer, and that such pass was furnished him, and that he did go to New Orleans and see the division superintendent touching the matter, is not denied. Jackson and his sister testify that in the interview with Turner, the division superintendent, suit for the personal injury was spoken of, the sister urging suit, and that Turner said there was no use in so doing, and that the company would give Jackson a lifetime job, Turner at the same time telling Jackson what job he would be given, and then and there telegraphing to the proper railroad official to make that particular job available to Jackson. After this arrangement had been made—after a contract for life employment had been agreed upon as some minds might conclude—Jackson insisted upon having it put in writing. He testified that he wanted something in black and white to show if Turner should thereafter cease to be superintendent, or if there should be changes made in the management of the company. He wanted a

visible memorial of the contract, to be used by him as evidence of its making if necessity should ever arise for such use.   The plaintiff's evidence shows, or tends to show, that Turner then said that he (Turner) would make out a contract (in writing, as insisted on by Jackson, under the circumstances adverted to above), and retain it to be signed by the president of the company when he came down, Turner saying that Jackson could come down and get it, or that he would send it to him.   With the agreement thus had Jackson was given his job, went to work, and continued to work for the company for several years, and without any other contract, agreement or understanding, until he was discharged, without cause, as he asserts.

Turner, the then division superintendent, in his answer to the eighth direct interrogatory, says: "I have no recollection of plaintiff ever threatening suit against the Illinois Central Railroad Company.   It was the custom in settling with employes, and, no doubt, others, in personal injury cases, to state to them that employment would be given them in such positions as they could fill, and that the company had to offer them, so long as they attended to their duties and filled such positions satisfactorily.   Plaintiff was given a position as night watchman for defendant at Pearl street crossing, at Jackson, Miss.

In direct interrogatory eighteen, Turner was asked this: "In settling such claims (personal injury claims) did not said company, through you, ever promise such claimant that the company would furnish him employment for life, during good behavior, in such positions as he could fill, it being fully understood that the injured party must attend to his duties and give satisfaction?"   To which he answered: "Answer to interrogatory number eight will cover this question."   He was then asked, in interrogatory nineteen, "If so, state the name of any such injured persons with whom said company made such settlements through you."   To this he answered: "At this late day I can only recall one definitely, named Phil Macklin."

In view of this evidence we cannot say that it is incontestably

shown that there was no such contract made as plaintiff asserts, and that there was no question as to the making of the contract to be submitted to the finding of a jury.

We now come to consider, briefly, the supposed total failure of all of plaintiff's evidence to show authorty in Turner, the division superintendent, to make a contract for life employment. The references already made by us to the evidence shed much light on this question. In addition, Turner deposes that while usually he did not settle personal injury claims, yet he did so in particular cases referred to him, and he recalls the name of one person with whom he did make settlement, and just such settlement as it is claimed by plaintiff was made in the present case. In this case, too, the plaintiff had been referred to the division superintendent by the personal injury agent of the company, and Jackson, in his evidence, says, "when I got down there (to Turner's office in New Orleans), Mr. Turner knew all about it." It is true that Turner deposes that he had no authority to make contracts for life employment with any one, and that he knew of no officer of the company who had such authority. In view of his own evidence, that it was the custom of the company to make the contracts described by him in his answer to the eighth direct interrogatory, which are, in reality and effect, lifetime employments, and that he gives the name of one person with whom he actually made such a contract, it is plain that this witness, misunderstanding the essential characteristics of a life employment, boggled over the mere words, "life employment." For, in contracts for life employment, the employer would not be bound to retain in his service one who was unfaithful in performing his duties, or who was incapable of performing them, or if the employer had no work which the employe could perform. It seems clear to us that there was evidence showing, or tending to show, that the division superintendent had authority to make the contract in this case, claimed by plaintiff to have been made.

That the alleged contract is not within the statute of frauds is well settled, for it was possible of performance within one year. *Carnig* v. *Carr*, 35 Lawyer's Reports Annotated, 512, and the very full notes in which the authorities are cited. Nor is the alleged contract without consideration, nor is it against public policy. But we do not understand counsel for the railroad company to rest their argument in support of the action of the court below upon any of the last three named grounds.

For the error of the trial court in giving the peremptory charge for the railroad company, the judgment must be reversed and a new trial awarded.

*Reversed and remanded.*