## BALTIMORE & OHIO RAILROAD COMPANY *v.* WILLIAM H. KING

[No. 88, October Term, 1934.]

*Decided January 16th, 1935.*

The cause was argued before BOND, C. J., URNER, OFFUTT, SLOAN, and MITCHELL, JJ.

*William Preston Lane, Jr.*, and *Taylor Morrison*, with whom was *Joseph D. Mish* on the brief, for the appellant.

*Ellsworth R. Roulette* and *E. Stuart Bushong*, for the appellee.

BOND, C. J., delivered the opinion of the Court.

The judgment appealed from is one for damages for an alleged breach of an oral contract of the railroad company to employ the plaintiff for life, in consideration of his forbearance to sue on a claim for damages from injuries sustained in the year 1909; and the questions arise from a refusal of the trial court to direct a verdict for the defendant.

The plaintiff offered evidence tending to prove that he lost his left arm by having it run over on falling from a moving car, while he was employed as a brakeman. Whether he was at the time engaged in interstate commerce, so that his case would come within the provisions of the Federal Employers' Liability Act of 1908 (see 45 U. S. Code Ann. secs. 51-59), cannot be determined from anything in the record. Releases offered in evidence were not attacked on the ground that the Federal Act did apply. See U. S. Code Ann. tit. 45, sec. 55; *Philadelphia, B. & W. R. Co. v. Schubert*, 224 U. S. 603, 32 S. Ct. 589, 56 L. Ed. 911. He was taken first to the Emergency Hospital in Brunswick, and then to a hospital in Baltimore, and remained in the latter hospital until some time in April, 1909. On May 1st, he went to work again at a job as switchman.

He was a member of the Employees' Relief Association maintained by this company, by virtue of which he was entitled to compensation for injury, irrespective of any

question of negligence or common law liability (see *Spitze v. Balto. & O. R. Co.*, 75 Md. 162, 23 A. 307), and in his application for membership, in 1906, had agreed that, in consideration of the company's contributions to the association or department, and its guarantee of benefits for injury or death, his acceptance of benefits should operate as a release of all claims against the company for damages by reason of such injury or death, and agreed to perform all acts deemed appropriate or necessary to effect the full release and discharge of the company. And in accordance with the regulations of the relief department, the company paid his hospital, surgical, and medical expenses from his injury in 1909, paid him benefits for the three months, February, March, and April, and bought him an artificial arm. One of the benefit payments, he testified, was paid him while he was still in the hospital, and the others subsequently. A full release and discharge was signed upon each such payment. But he testified that, while he was still in the hospital in Baltimore, he was told by some one to go to the general manager's office there, that on asking his way at the main office building of the company, on a day not specified, he was directed to an office the door of which bore the title of general manager, that there he met an official who, he was told, was Arthur W. Thompson, now dead, and who urged him not to employ an attorney or enter suit against the company for damages, and said, "We are going to give you a job for life if you listen to me; there is something you can have at Baltimore or at Washington, as switchman, lots of jobs. * * * Leave the attorneys go, listen to me and you will have a job. When you get out you will have a job." Passes over the road for himself, and for his wife when he might marry, were also promised him, he said, and he added that he did subsequently receive passes over a greater extent of the lines of the company than he would have been entitled to receive as an employee under the company's general regulations.

When shown releases signed at or about the dates of the checks for benefits, the earliest dated March 16th,

1909, he first denied the signatures of them, but later admitted them, asserting, however, that he signed no release, and suggesting that these releases shown him may have been signed under other papers. His statement is not entirely clear, perhaps, but in some answers he appears to suggest that the releases may have been signed by means of carbons under papers he meant to sign. The release, he said, "might have been underneath some papers that I signed"; "I didn't sign it open like that"; "that is my name and I signed in that way." And in response to a final question by the court, confining his attention to the signature on each release, he said, "That is my name and I wrote that."

The plaintiff remained at work, in the employ of the railroad company for the succeeding twenty-two years, with one interruption. After his recovery, he was employed as a switchman in the Brunswick yard from May 1st, 1909, until some time in 1915, when the job was discontinued, was "on call" or a "caller" for two or three months, then returned to work as switchman at Brunswick, until September, 1931, when the job was finally abolished; and he testified that he has not since been able to find any position with the railroad company, or any one else, by which he could make a living, except that he had five days' work with the company in December, 1931. He acknowledged, however, that upon the abolition of the switchman's position he was offered another job, at pay equal to that of switchmen, in pushing buttons to direct cars on different tracks in the yard, and that this job required no physical exertion, but he had refused it, he said, on account of his injuries, because he could not steady his head to sit up pushing buttons for any length of time, that he had hemorrhages with anything like that, sitting in the house he was first on one chair and then on another, could not sit still that long, could not sit and look steadily. And he said he had explained the condition to the railroad company. He was told to go to Rockville to look over a job as watchman there, and, after consultation with his wife, he did so, but upon learning the

expense of house rentals at Rockville, it appeared to him that he would not have sufficient margin, and a Mr. Kritz, a civil engineer and division engineer, said there was no use in offering the job to him, and the job was not in fact offered to him.

The "By-Laws and Organization" of the company in force at the time of the plaintiff's injury and since, admitted by both the parties to be such, were introduced in evidence at the conclusion of the examination of the plaintiff, to show the authority of the various officials mentioned in the plaintiff's testimony. The general manager is by these given "charge of Transportation, Construction, Maintenance of Way and Structures, Equipment, Telegraph, Real Estate, Purchase of Material, Insurance, Relief, Savings and Pension Departments and Police Service." He is to be responsible for the regular, safe, and economical operation and the efficient condition of the railroad and its appurtenances. The only clause among those referring to his duties and powers that is concerned with accidents, and, as the court understands, the only clause cited by the plaintiff's counsel as possibly applicable to the making of a contract with an injured employee, is one that, "in case of accidents, he shall immediately report the facts to the Third-Vice-President and the President, and as soon as possible, investigate the cause, and communicate to them in writing the result, together with his views and action upon the case."

The plaintiff himself was the only witness who testified on his behalf.

The defendant placed in evidence the releases referred to and introduced evidence tending to contradict in its essentials the evidence of the plaintiff with respect to any contract of employment for life, or for any period, and to show that Arthur W. Thompson was not the general manager in the year 1909, that in fact there was no general manager in that year, and that Mr. Thompson was then chief engineer of maintenance of ways, and became general manager on December 8th, 1910, that the plaintiff was never in Mr. Thompson's office, that he signed the

full releases on receiving benefit payments after hearing them read, and without any qualification or stipulation for employment. There was also evidence tending to prove that the position of push button operator was one of lighter work, at higher pay, open to the plaintiff by virtue of his seniority in employment, under an agreement between the company and the brotherhood of railroad trainmen. It was also testified for the defendant that the position at Rockville was offered to the plaintiff but refused by him.

The plaintiff contends, then, for an informal, oral contract, in consideration of his forbearance to sue on a common law liability, made at a time when he was accepting benefits from the relief association, and when the company was receiving from him signed agreements of release and discharge of common law liability. The contract would be one of extraordinary extent, for according to the plaintiff's testimony he was guaranteed employment throughout his life, not that he should merely be taken on as an employee, subject to the vicissitudes of the business and the existence of jobs, but that he should be employed throughout his life at all hazards, regardless of the existence of jobs. And the employment was to be so far subject to his selection that he might reject jobs offered him which, though extremely easy, might require him to sit still longer than his nervous condition would permit, or might require him to pay higher house rents than he felt able to pay. Yet, as he describes it, the contract was for employment without definite limitation of the jobs which might fulfill the obligation on the side of the company.

Several obvious questions are raised by the case: That of the effect of the previous agreement that acceptance of the relief benefits should be a release, and the effect of the additional releases given by the plaintiff, or signed by him, on receiving the benefits (see U. S. Code Ann. tit. 45, sec. 55; *Elliott, Railroads* (3rd Ed.) secs. 2077, 2078, and 2080) ; that of permitting a parol alteration of these written contracts of release by adding the

stipulation for life employment; that of the authority of the alleged agent or officer to make such an additional contract for the company; that of the sufficiency of the contract testified to and that of a breach by the company of the contract, if made, in view of the offer of further work and its refusal by the plaintiff. But it is not found necessary to discuss all these questions. It is deemed sufficient to say that, under previous decisions of this court, the contract testified to would be lacking in the definiteness necessary to enforceability.

In the case of *Heckler v. Balto. & O. R. Co.*, 167 Md. 226, 173 A. 12, the court, on a demurrer to a declaration, found that an alleged contract in substantially the same terms was unenforceable for lack of definiteness, in that neither the work to be furnished nor the wages to be paid were specified in it. In that case the undertaking alleged was that the plaintiff would be given steady employment during his life, or so long as he was able to do work of any kind about the shops or railroad, and in the present case the testimony was that the plaintiff was to be given a job for life, that the company's officer or agent said there was something he could have at Baltimore or at Washington, as switchman, lots of jobs. The plaintiff's counsel, in argument, construes this to have been an undertaking that the plaintiff should be employed as switchman during his life, but the court disagrees, and thinks the words do not permit that restriction of the employment. The plaintiff himself apparently did not regard the job of watchman at Rockville as a departure from an agreement, nor did he, according to his testimony, object that the job of button pushing, offered and refused by him, was excluded by anything other than his nervous condition. The statement attributed to the railroad official, indeed, referred to the positions as switchman only as some then open in Baltimore or Washington, where the plaintiff never did take employment. If life employment was intended to be guaranteed, no specific task seems to have been contemplated for it, and no wages were mentioned or agreed upon. Tests of performance

appear therefore to be lacking. The parties provided no means by which a court could determine their differences on either subject. While it is true that such informal conversation as that reported might naturally be lacking in specification, the fact does not provide an escape from the requirement of definiteness; it rather tends to indicate that no contract was in the contemplation of the parties. "Such contracts at least should be specific and definite, with little or no room for misunderstanding, even if they are not required to be in writing." *Arentz v. Morse Dry Dock & Repair Co.*, 249 N. Y., 439, 164 N. E. 342, 344. On this construction, the decision in the *Heckler* case, *supra*, seems directly in point, and to support the right of the defendant to direction of a verdict in its favor; and the refusal to direct it could not be affirmed without overruling that decision.

> *Judgment reversed without a new trial, with costs.*