CHARLES A. WEBB *v.* GORDON S. DUVALL ET AL., RECEIVERS

[No. 13, January Term, 1940.]

*Decided March 5th, 1940.*

The cause was argued before BOND, C. J., OFFUTT, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Hall Hammond,* for the appellant.

*Gordon S. Duvall,* with whom was *Alexander W. Bowling, Jr.,* and *Edward L. Ward,* on the brief, for the appellees.

MITCHELL, J., delivered the opinion of the Court.

The facts in this case, as they appear in the record, chiefly in a stipulation of counsel, with some brief testimony, may be stated, so far as necessary to a decision herein, as follows:

The National Wholesale Liquor Company, a corporation, was engaged in the rectification of spirits, its plant being located in Baltimore County. For some time prior to March, 1937, the affairs of the company had not been

progressing with financial success, resulting in the formation of a creditors' committee, which committee designated Charles A. Webb, the appellant, as its representative to manage and operate the company's plant. In the course of these duties he purchased certain printing presses and equipment to be used in the business, for which he paid $600 of his own money. To secure himself he prepared a chattel mortgage, dated March 23rd, 1937, which was signed by Saul Fehlden as the company's purchasing agent, witnessed by Joseph Mund as its vice-president, acknowledged by Fehlden and sworn to by Webb, and when offered in evidence bore the corporate seal. The amount named in the mortgage was $1500, the difference of $900 representing other indebtedness of the company to Webb. The instrument was duly recorded among the chattel records of Baltimore County, and, as recorded, the seal is wanting.

On September 28th, 1938, a creditors' bill was filed in the Circuit Court for Baltimore County, seeking a receivership of the corporation; and, on October 13th following, the receivers, appellees here, were appointed. On February 16th, 1939, as the result of a fire in the building in which the printing plant was located, the presses and equipment were destroyed. This occurred ten days before the property was scheduled to be sold at auction by the receivers. A pro-rating of the proceeds of a fire insurance policy, which the receivers had obtained, covering all the property in the burned building, produced $472.66 as representing the equivalent of the machinery embraced in the mortgage. Webb having filed his claim in the receivership proceedings, based upon the chattel mortgage, it was resisted by the receivers, who contended that the instrument was defective, being at best an equitable mortgage, and that Webb could only share in the insurance proceeds *pari passu* with creditors becoming such after the date of the mortgage. As claims totaling $7400 were filed by general creditors who became such after March 23rd, 1937, Webb's share, as calculated by appellant's counsel, would be approximately

$28.  Webb, however, contended that the purchasing agent had authority to give a binding chattel mortgage on behalf of the company, without corporate action, notwithstanding the corporation at the time of the execution of the paper had officers and directors.  The chancellor held that the instrument gave Webb only an equitable lien upon the chattels described therein, and ordered that, in the distribution of the insurance money, creditors subsequent to the date of the mortgage should share *pari passu* with Webb, but prior creditors should not share therein. From the decree against him, Webb has appealed.

The single question presented, therefore, involves the construction and effect of the so-called chattel mortgage. If it is a valid instrument for the purpose indicated by its contents, the appellant is a preferred creditor and entitled to the amount of his lien, so far as funds are available—$472.66.  In determining the efficacy of the instrument to achieve its apparent intent, the circumstances immediately surrounding its execution must be considered, including the subsequent action or non-action of the governing officials of the corporation with respect to it, with knowledge of its existence.  According to the stipulated facts, the corporation minutes show that there were subsequent meetings of the officers and directors, but in none of them is the mortgage mentioned, and of course no corporate action is disclosed therein giving authority to Fehlden or anyone else to execute the mortgage.  It is conceded that the printing presses were used in the plant until the receivers were appointed.

The appellees suggest that there is no proof that Fehlden was the purchasing agent at the time the mortgage was given, and that, as a matter of fact, because Webb was buying supplies for the corporation, the latter was actually the purchasing agent.  But the stipulation refers to the mortgage as being signed by "the purchasing agent, Saul Fehlden;" the body of that document calls him "its purchasing agent;" the acknowledgment so designates him; and his signature to the instrument is over the word "president," which has a line drawn

through it, and the words "purchasing agent" apparently added, in the same manner as Joseph Mund's witnessing signature is followed by the lined-out word "secretary" and the apparently written-in words "vice-president." Webb testified: "I was appointed by the creditors to go out there and run it, and there were no officers there, and when I qualified, I got the only officer that was there, I got the man that was running the whole place to do it." We may, therefore, fairly assume that Fehlden was the purchasing agent at the date the mortgage was given.

The picture presented by the record is that of a company, organized as a corporation, reaching a stage in which the corporate machinery functioned but weakly, if at all; and where creditors, fearing the enterprise was headed toward failure, had undertaken to divert its course; the situation culminating in the appointment of the receivers. Before the receivership, however, Webb, representing the creditors' committee, in his effort to rehabilitate the business, found it advisable to install the printing presses, and, first expending his own funds in the purchase thereof, prepared an instrument to secure reimbursement to himself; when he looked for someone to sign it, he found the purchasing agent, the vice-president acting as a witness to the document, because, as Webb states, "if there had been some other officers there, I would have gotten them, but when there is not, the vice-president takes the place of the president." The presses being installed, were used thereafter in the operation of the business and for its benefit; and, the mortgage being recorded, no protest emanated from the corporation officers, the corporation continuing to utilize this equipment up to the time the receivers qualified.

Prior to the formation of the creditors' committee, the object of which was to salvage the corporation, the latter apparently maintained as a part of its organization a printing department; and when Webb purchased the equipment for use in this branch of the business, his action was in furtherance of the purpose for which the committee was created. The equipment, after its instal-

lation, continued to be used in the conduct of the business until the receivers took charge; and there was no complaint from any one, individually or officially, as to the necessity for the purchase; nor, as stated, was there any objection to the chattel mortgage after its recordation.

The general principle is that a corporation acts through its directors; and such action, to bind the corporation, must appear in the minutes of board meetings. Exceptions, however, are found in those instances where an irregular act is later ratified by the corporation in one of several ways, among them being acceptance of the benefit derived from the transaction and consequent acquiescence therein. Many of the courts regard the acceptance of the benefit as a ratification of the authority, where such authority is originally doubtful, defective, or wanting.

In *Galveston, H. & H. R. Co. v. Cowdrey,* 11 Wall, 459, 476, 78 U. S. 459, 20 L. Ed. 199, a Texas corporation unsuccessfully undertook to repudiate a mortgage because its execution had been authorized at a directors' meeting held outside the state; and the court remarked: "Can it take all the benefit of the transaction, get off its bonds on the business community, and then repudiate its mortgage for such a cause?"

In *Reiser Co. v. Radio Show,* 169 Md. 306, 181 A. 465, 467, where a corporation sought to repudiate a supplemental contract because it was signed by a director, the original contract being initialed by an officer of the corporation, this court said: "But assuming, without laboring the point, that neither was authorized, nevertheless there is evidence to show that appellee, with knowledge of all material facts, adopted and confirmed the agreement embodied in the two papers. Such conduct, commonly and for convenience called 'ratification,' has the effect of binding the corporation to perform the terms of the agreement as fully as though it had in fact been authorized in the first place."

In *Grape Sugar & Vinegar Mfg. Co. v. Small,* 40 Md. 395, in which a corporation sought to avoid liability on

a contract made by its acting president, it was said: "The plaintiff proved that the work was done under a contract made by the acting President of the company—that it was necessary, to enable the appellant to carry on the business for which it was incorporated; and further, that the services thus rendered under the contract, were accepted by the appellant, without objection, and without an intimation that the acting President was not authorized to contract for the same. There was evidence then, in our opinion, legally sufficient to warrant the jury in finding that the work was done by the authority, or that it was subsequently accepted, and the contract under which it was done, ratified by the appellant."

In *Edelhoff v. Horner-Miller Mfg. Co.*, 86 Md. 595, 39 A. 314, the court upheld a chattel mortgage executed by certain officers of a corporation, although express authority from the directors to so pledge its assets was lacking, upon the ground that the transaction being designed to raise funds with which to pay its debts and continue its business, the full benefit of which was received by the corporation, without objection, it was therefore presumed to have authorized or ratified the act of its officers.

*Buchwald Co. v. Hurst*, 111 Md. 572, 75 A. 111, 114, quoting 5 *Thompson on Corporations*, par. 6179, uses this language: "Where * * * a corporation loosely commits all its business affairs to a superintendent, and he executes a chattel mortgage to secure a depositor who threatens to withdraw his deposit, the mortgage will be sustained so as to allow the depositor a preference on final distribution after insolvency."

13 *Am. Jur.* 901, *Corporations*, sec. 941, states the general principal that: "The power to mortgage or pledge the personal property of a corporation does not inhere in the officers of the corporation, such as the president or the secretary, and it has been held that the general agent of a manufacturing corporation, appointed to carry on its business, has no implied authority to mortgage or pledge its machinery." But, "A corporation, like

an individual, may ratify and thereby render binding upon it the originally unauthorized acts and contracts of its officers or other agents;" Sec. 972, p. 927. "The transaction must be ratified in its entirety, since a corporation cannot accept the benefits of the unauthorized act and reject its burdens. It is consequently the general rule that where a ratification is established as to a part of a transaction, it operates as a confirmation of the whole;" Section 977, p. 930. "Such ratification may be expressed or implied and may result from acquiescence or a failure to repudiate and return the proceeds of the unauthorized transaction, from the receipt and retention by the corporation of the benefits of the unauthorized transaction, or from affirmative approval, performance, or a course of action consistent only with the affirmance of the unauthorized transaction." Section 981, p. 933. "Acquiescence in, or the receipt and retention of the proceeds and benefits of, an unauthorized transaction do not amount to ratification if not accompanied by knowledge of the material facts concerning the transaction." Section 978, p. 930.

From the foregoing authorities, as applied to the facts in the instant case, it is our conclusion that there was that degree of constructive knowledge and implied ratification on the part of the corporation with reference to the purchase of the presses and equipment, and the execution of the chattel mortgage involved herein, to support the appellant's contention that his claim was a valid subsisting lien at the time of the destruction of the property by fire; and that the appellant accordingly is entitled to his proportion of the proceeds of the insurance. It follows that there was error in the decree appealed from, and the same will be reversed.

*Decree reversed, with costs, and case remanded for the passage of a decree in accordance with the views herein expressed.*