PULLMAN CO. *v.* RAY

[No. 51, October Term, 1952.]

*Decided January 9, 1953.*

*Motion for rehearing, filed February 9, 1953, denied February 13, 1953.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Douglas N. Sharretts*, with whom were *Harlan, Sharrets and Purcell* and *Mason P. Morfit*, on the brief, for appellant.

*Joseph Allen*, with whom were *Fred Oken* and *Jacob D. Hornstein*, on the brief, for appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a judgment on a jury's verdict for damages for breach of an alleged oral contract of life employment. The questions raised are as to the correctness of the rulings on demurrer and motion for judgment, the correctness of the rulings on the demurrer prayers and motion for judgment *n.o.v.*, and the correctness of the court's charge to the jury.

The original declaration alleged that the plaintiff was employed as a Pullman porter on June 1, 1924, when he had an accident in the course of his employment and suffered serious injuries including the loss of a leg; that while convalescing the defendant offered "to employ him for the balance of his life", which offer he accepted, and "in consideration of said agreement the plaintiff surrendered his right to damages in an action at law against the defendant"; that in accordance with the agrement he was employed by the defendant until July 22, 1949, when he was discharged without just cause. The plaintiff claimed damages for breach of the agreement.

Before pleading the defendant took the plaintiff's deposition and the plaintiff testified under oath that the alleged oral contract was made on behalf of the defendant by Samuel McNabb, its District Superintendent at Baltimore; that nothing was said at that time about salary, or what his duties would be except that they would be light, and that no specific job was mentioned. Later in the examination the plaintiff testified, however, that McNabb said "he was going to give me a job at the Camden Station carrying diagrams".

The defendant then filed a demurrer to the declaration attaching thereto a copy of the deposition. He also moved for judgment on demurrer. The ground of the motion was that the plaintiff could not, consistent with the facts testified to under oath in the deposition, amend the declaration so as to state a good cause of action. The demurrer was sustained, apparently on the ground that the declaration was too indefinite in that it did not state an agreement to employ in a specific job or at a specific compensation, but leave to amend was granted. Thereupon an amended declaration was filed adding allegations to the effect that the defendant offered the plaintiff lifetime employment as a diagram messenger at Camden Station, Baltimore, at a starting wage of $87.50 per month with compensation thereafter at the regular and customary rate, taking into consideration length of service and seniority. A demurrer to this declaration was overruled. We think the ruling was correct. The contract alleged in the amended declaration was sufficiently definite to meet the test laid down in *Heckler v. B. & O. R. Co.*, 167 Md. 226, 173 A. 12, and *B. & O. R. Co. v. King*, 168 Md. 142, 176 A. 626.

Of course, the deposition formed no part of the plaintiff's pleading, and the scope of the demurrer could not be enlarged by the defendant's action in attaching the deposition to the first demurrer. We see no analogy to a bill of particulars. When filed pursuant to demand, a bill of particulars becomes a part of the declaration and hence may be reached by demurrer. *Gaver v. Frederick*, 175 Md. 639, 643, 3 A. 2d 463. The motion for judgment was based on the theory that the court could not properly permit an amendment in contradiction of the deposition. But it is well established that the allowance of amendments is discretionary with the trial court and not subject to review. *Poland v. Chessler*, 145 Md. 66, 69, 125 A. 536.

The appellant contends that the motion was tantamount to a motion for summary judgment, under Summary Judgment Rule 1, of the General Rules of Practice

and Procedure. It is clear that the rule was designed not as a substitute for trial but only to dispose summarily of cases when there was no genuine controversy as to the material facts. There is no allegation of a lack of controversy in the motion in the instant case. We may assume that a pretrial deposition taken under Deposition Rule 1 could be used under Rule 11 (2) as an admission in lieu of an affidavit. See Explanatory Notes, 1947 Supplement to the Code of 1939, pp. 2109, 2114, and 3 *Barron, Federal Practice* (Rules ed.) Sec. 1236, p. 90, and cases cited construing Federal Rule 56 from which our rule was adapted. But it would not be conclusive where there is a genuine dispute of fact. Ordinarily, a pretrial deposition is taken either for the purpose of discovery or for use at the trial to impeach inconsistent testimony. The fact that a previous inconsistent statement was made under oath would not be ground for a directed verdict or preclude the jury from believing the testimony at the trial. *Crunkilton v. Hook,* 185 Md. 1, 5, 42 A. 2d 517; *Florentine v. State,* 184 Md. 335, 40 A. 2d 820; *Porter v. Greenbrier Quarry Co.,* 161 Md. 34, 155 A. 428. For the same reason, it would appear that the trial judge should not grant a summary judgment where the material facts are disputed, for to do so would usurp the jury's function, where a jury trial is prayed. There is also force in the appellee's contention that although no counter affidavits were filed, there was no real inconsistency between the statements in the deposition and in the amended declaration, at least none that could not be explained. The effect of the allowance of the amendment to the declaration was to permit the plaintiff to explain, amplify or controvert the previous admissions. We find no error in the ruling on the motion.

In regard to the contentions as to the legal insufficiency of the evidence, it is undisputed that the plaintiff was hired by District Superintendent McNabb as a sleeping car porter in 1923. On Sunday, June 1, 1924, while on duty and working as an employee on an all Pullman

train making an extra run from Chicago to Washington, D. C. he sustained injuries while the train was in the Washington Terminal. The cause of the accident was not disclosed. He was taken to the Emergency Hospital in Washington where he remained until August 13, 1924, when he was sent to his home in Baltimore. McNabb came to see him at his home. He "saw that I were worrying, which I were, and he said to me that I didn't have anything to worry about, he said, because The Pullman Company will give you a job, he said, we are going to provide a job for you as soon as you are able to go to work and get along with your artificial leg." The Company paid for the artificial leg and the hospital expenses. McNabb "didn't say I'd have any specific job on that first visit, but he did say I'd have a lifetime job, whenever I would be able to go to work." McNabb visited him 8 or 10 times at his home and told him to come to the office when he was able to do so. The appellee got his artificial leg in November, and reported to McNabb at his office in the American Building. On this visit McNabb mentioned the diagram messenger job, but the appellee was still not able to work. Whenever he called at the office, once a week, McNabb told him the diagram messenger job would be his for life. About two weeks before he went to work, McNabb told him his salary would be $87.50 a month, "that's what they were going to start me off at." He said, "Willie, from time to time I'm quite sure that you will get a raise, according to the Pullman Company * * * rules and regulations of your seniority." He went to work in January, 1925, but not as diagram messenger. He worked at "light duty at the lien room", as stockkeeper or storekeeper's helper, for about two years before he became diagram messenger. He worked at the latter job until 1942, when the job was eliminated and he was again assigned to the stockroom although he was listed as a messenger until 1946. On July 22, 1949 he was furloughed. At the time of his furlough he was receiving $213.90 a month and was 55 years old.

The appellee further testified that he did not file any claim or suit against the Pullman Company on account of the accident. When asked why he did not do so, he answered: "The first visit Mr. McNabb made to my house changed my mind. I didn't give it a thought after that. Mr. McNabb promised me a lifetime job and artificial legs as I needed them and I didn't feel I had any time to bother with the Company, if the Company had brought such a suggestion to me that I'd be able to raise my family during my lifetime and I abandoned the idea of any law suit."

Mr. McNabb died in 1936. The appellee produced two other witnesses, one of whom testified without objection that in November 1925 he was working for the appellant as a conductor. When he was in the office a wire came for Mr. McNabb advising him that an employee, Magers, had been killed in a wreck. Mr. McNabb said: "Well, it's too bad about Magers, but the damages in a case like this are not near as bad as if you injure a man permanently. He said, if we had not been able to give Willie Ray a lifetime job and take care of him, that could have been a very expensive proposition with [a man] as young as he was at the time." The other witness, also a conductor, testified that Mr. McNabb told him in 1929 that Ray had "a lifetime job with our company, and he was then working as diagram man at Camden Station."

The appellant produced testimony that there was no record of the Company to show any offer or agreement by McNabb as to lifetime employment of Ray, nor any letter or communication to the main office. There was nothing in the by-laws of the Company or minutes of the directors authorizing McNabb or any District Superintendent to make such an offer. It was also shown that the positions of diagram messenger and stockkeeper have both been abolished; Ray had not been discharged but was carried as a furloughed employee with top seniority on the clerical roster. There was no job available that he could fill without stenographic

or other educational qualifications that he did not possess. The appellant also put in evidence, over objection, a collective bargaining agreement between the Company and the Pullman Clerks' Association. It is contended that this agreement, dealing with the furlough of employees when jobs are eliminated, superseded the alleged oral contract.

The appellant's first contention on the demurrer prayers is that there is no evidence that Ray had a valid claim that he might have asserted against the Company in 1924 when the accident occurred, and hence the alleged agreement was without consideration. It appears to be conceded that there could have been no claim for workmen's compensation because the District of Columbia statute was not enacted until 1927, and neither the Federal Employer's Liability Act* nor the Maryland Act† would have been applicable. But it does not follow that he would have been without remedy against his employer in an action at common law. *Cf. Dean v. H. Koppers Co.,* 49 App. D. C. 230, 263 F. 626 and *Woodward & Lothrop v. Lineberry,* 60 App. D. C. 164, 50 F. 2d 314. "Forbearance to sue for a lawful claim or demand is sufficient consideration for a promise to pay for the forbearance, if the party forbearing had an honest intention to prosecute litigation, which is not frivolous, vexatious or unlawful, and which he believed to be well founded, even though it may in fact be unfounded." *Snyder v. Cearfoss,* 187 Md. 635, 643, 51 A. 2d 264, 267; *Snyder v. Cearfoss,* 190 Md. 151, 160, 57 A. 2d 786. See also *Hartle v. Stahl,* 27 Md. 157, 173; *Bowen v. Tipton,* 64 Md. 275, 288, 1 A. 861; and *Williston, Contracts* (Rev. ed.) Sec. 135. While the details of the accident were excluded by the trial court, the fact that Ray was injured in the course of his employment was enough to indicate at least a potential cause of action, and it is immaterial that he might have been unable to establish liability. It is only necessary that Ray should have "had an honest and reasonable belief in the possible validity of a claim." *Snyder v.*

---

* Reporter's Note: 45 U. S. C. A. secs. 51-59.

† Reporter's Note: Code (1951), Art. 101.

*Cearfoss,* 187 Md. 635, 644, 51 A. 2d 264, 268. His testimony that after the proposal of a lifetime job he changed his mind and "abandoned the idea of any lawsuit", was some evidence of such a belief.

The appellant contends, however, that there was no evidence of an agreement to forbear. It is true that in *Heckler v. B. & O. R. Co., supra,* there was an allegation of settlement and release. But recovery is not limited to cases where there is a bilateral contract; proof of a unilateral contract will suffice. In *B. & O. R. Co. v. King, supra,* there was evidence, not of a promise to forbear, but merely of a request to do so. See also *Young v. Boyd,* 107 Md. 449, 69 A. 33, and *Devecmon v. Shaw,* 69 Md. 199, 14 A. 464. In *Snyder v. Cearfoss,* 187 Md. 635, 641, 51 A. 2d 264, 267, there was no evidence of a promise to forbear and no evidence of an express request. The promise to share the estate was simply conditional: "if you do not join with Jacob Snyder in any action he may take against me", followed by forbearance to join in his caveat proceeding. It was said (p. 644): "We hold that forbearance to exercise a legal right constitutes sufficient consideration for a contract, although there is no express promise to forbear, if such forbearance exists at the request of the party promising to compensate for the forbearance and in reliance upon such promise. *In re All Star Feature Corporation,* D. C., 232 F. 1004, 1009." In the case cited Judge Learned Hand said: "Forbearance, even without an agreement to forbear, will serve as a consideration, if it be completed."

In *Williston, Contracts* (Rev. ed.) Sec. 136, it is said that "forbearance for a reasonable time if requested is a sufficient consideration even though no promise of forbearance is made, a unilateral contract being as good as a bilateral", citing *In re All Star Feature Corporation, supra,* and other cases. The learned author then says: "Mere forbearance without request, however, is insufficient", but he continues: "If the offer contemplates a unilateral contract for which the consideration is for-

bearance, it is almost impossible to suppose that the parties can have contemplated perpetual forbearance * * *." In a footnote, he states: "Possibly the giving of a release of the claim or the lapse of the period of limitation might be regarded as the equivalent of perpetual forbearance." In *Harvey v. J. P. Morgan & Co.,* 166 Misc. 455, 2 N. Y. S. 2d 520, cited by *Williston,* a request seems to have been implied from a statement of the condition. In *Corbin, Contracts,* (1950 ed.) Sec. 137 it is said: "As in the case of other unilateral contracts, actual forbearance to sue does not involve the surrender of any right * * *. There seems to be a strong tendency for a court to find that a forbearance that was actually given was requested or even was promised in advance by implication." See also the discussion in *Corbin,* Secs. 139 and 151; *Albany Nat. Bk. v. Dodge,* 41 Wyo. 286, 285 P. 790, 796; and note 74 A. L. R. 293. In the instant case there can be no doubt that the possibility of suit was present in the minds of both Ray and McNabb. We think it can be inferred from the circumstances that McNabb's offer was not only conditional upon the abandonment of the suit, but that the condition was bargained for and not a mere gratuity.

Since we think a contractual undertaking can be implied from the circumstances, it is unnecessary to rest our decision upon the broader ground set out in Sec. 90 of the Restatement, Contracts, which provides: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." This section was cited with approval in *Anderson v. Truitt,* 158 Md. 193, 199, 148 A. 223. *Williston, Contracts* (Rev. ed.) Sec. 139 is somewhat critical of the doctrine of "promissory estoppel" as a substitute for consideration, but in Sec. 140 approves the principle announced in Sec. 90 of the Restatement with the comment that it "does not assert a sweeping

rule that in every case action in reliance is sufficient support for a promise." *Corbin, Contracts* (1950 ed.) Sec. 194, et. seq. discusses the section in great detail and supports it by reference to cases involving a wide variety of situations.

The appellant contends, however, that the contract cannot be enforced against the Company in any event because McNabb was not authorized to make it and the Company did not ratify it. There is, of course, no evidence of prior authority or subsequent ratification; if authority is found it must therefore be implied. But it is well established that a corporate officer or agent has no implied authority to make an agreement for life-employment, even though he may be generally authorized to hire. *C. & P. Tel. Co. v. Murray,* 198 Md. 526, 84 A. 2d 870. See also *Williston, Contracts* (Rev. ed.) Sec. 1652, citing *Heaman v. E. N. Rowell Co.,* 261 N. Y. 229, 185 N. E. 93. However, it was noted in *Heckler v. B. & O. Ry. Co., supra,* that there may be an exception where the agreement for lifetime employment is in consideration of the release of a claim for damages, and the question was left open in that case. It has been held that proof of authority to settle claims is not enough. *Cleveland Ry. Co. v. Green,* 126 Ohio St. 512, 186 N. E. 365, 87 A. L. R. 1268, and cases cited. In *Maxson v. Michigan Cent. R. Co.,* 117 Mich. 285, 75 N. W. 459, it was held that a division superintendent had no implied authority to bind the Company to life employment, in consideration of the settlement of a claim for damages on account of injuries.

The case principally relied upon by the appellee for the so-called exception is *F. S. Royster Guano Co. v. Hall* (4th Cir.) 68 F. 2d 533, 537. While the court in that case discussed the apparent authority of the local superintendent, the point stressed was that there was a settlement reported to the Company officers and an executed release. Judge Parker, speaking for the court said: "The defendant cannot accept the fruits of a settlement and then assert that the agent who made it had

no authority to settle. We do not mean to say that acceptance and reliance upon a release is, in the absence of knowledge, a ratification of the settlement as made; but it is a recognition of some authority to settle in the one who has obtained it." See also *General Paint Corp. v. Kramer,* 10 Cir., 57 F. 2d 698, 703. In *Starr v. Superheater Co.,* (7th Cir.) 102 F. 2d 170, 176, cited in the *Murray* case, *supra,* it was said that the exception is "based upon sound elements of estoppel." In *Eggers v. Armour & Co.,* 129 F. 2d 729, 733, it was held that the case should be remanded to admit evidence "relative to the circumstances surrounding the making of the alleged contract [with the employment manager] and relative to the recognition of its existence by defendant's officers in charge." On the other hand, in the recent case of *Savarese v. Pyrene Mfg. Co.,* 9 N. J. 595, 89 A. 2d 237, 241, it was held that authority to offer life employment could not be implied from a promise made by a vice-president following an injury to an employee, where there was no evidence that the matter was ever brought home to the managing directors. *Cf. Horvath v. Sheridan-Wyoming Coal Co.,* 58 Wyo. 211, 131 P. 2d 315.

In the instant case, we think there are no facts to support a theory of estoppel. McNabb was not a corporate officer and there is no evidence that his offer to the appellee was ever made a matter of record or communicated to the higher officers of the Company. There was no release of the claim to charge the Company with notice. The mere fact that the bills for hospital expenses and artificial leg were paid by the Company and that Ray was re-employed would not imply that he had agreed to release his claim or that he had been offered lifetime employment in exchange for forbearance to sue. His employment in several different capacities which continued as long as there was work that he was capable of performing would not indicate that he stood in any better position than the ordinary employee. As we said in the *Murray* case, *supra,* (198 Md. 531): "If corporate officers could enter into contracts giving per-

sons of their selection employment for life, the directors might be deprived of authority. To justify the court in finding such an employment, there must be proof that there was definite authority, by by-law, action of the board of directors, or otherwise, to make such a contract * * * or that the contract was ratified by the corporation or its fruits were accepted with full knowledge of the circumstances of their acquisition." We think the appellee has failed to bring himself within the rule stated.

Since we find no evidence legally sufficient to support a recovery against the Company upon McNabb's promise, it is unnecessary to discuss the other points argued, that in any event the promise of employment was always conditional upon there being work available which the appellee was competent to perform, or that the agreement was modified to that extent by the collective bargaining agreement to which appellee was necessarily a party.

*Judgment reversed and entered for the defendant, with costs.*

HAMMOND, J., filed the following dissenting opinion.

In *Heckler v. Balto. & Ohio R. Co.*, 167 Md. 226, 173 A. 2d 12, 14, this Court, in refusing effect to an alleged lifetime contract because its terms were not sufficiently definite, said this: "Holding as we do that the declaration alleges that the settlement was made by the corporation itself, we have not found it necessary to discuss the question whether a contract of employment made in settlement of a damage suit for personal injuries incurred in the service of a corporation, by an agent with apparent authority to settle the claim, is an exception to the general rule as to the necessity for express authority to make a contract for life employment. This question is ably discussed in *F. S. Royster Guano Co. v. Hall* (C. C. A. 4th) 68 F. 2d 533. There a number of cases are cited which recognize such an exception."

In *C. & P. Telephone Co. of Baltimore City v. Murray*, 198 Md. 526, 84 A. 2d 870, this Court held that in the absence of a consideration in addition to the promise to work, a lifetime contract could not be made by a company employee or officer without the proof of definite authority to make such a contract under a by-law or resolution of the board of directors. The Court found in the *Murray* case that there was no independent consideration. However, the Court went on to say: "If the employee has purchased permanent or life employment for a valuable consideration additional to the services which he has contracted to render, a discharge without good cause may constitute a breach of contract." The Court continued: "Many Courts in this country have held that a contract by which a corporation, in consideration of the release of a claim against it for damages, agrees to give the claimant permanent employment, is valid and enforceable, and is equivalent to life employment or employment for such length of time as the employer has work which the employee is able and willing to perform in a satisfactory manner . . . it has been held that where an injured employee is induced to sign a release of his claim for damages on condition that he be given permanent employment, and the contract is clear and definite, the employer is estopped to deny the authority of the officer who made the promise, on the equitable principle that an employer should not retain the advantage or benefit arising from the promise and at the same time deny the authority of the officer who made it." The Court found that a settlement of a claim was an independent and additional consideration.

Having clearly pointed out the road to be travelled by a legal vehicle factually equipped to use it, the Court, in the instant case, when confronted with such a vehicle, refuses it access to the road previously clearly marked and shunts it off onto, what seems to me, an archaic, unrealistic and illogical path, totally unsuited to it, and which unjustly penalizes the appellee in the prosecution of his *bona fide* claim.

All of the Courts which apply what I conceive to be the correct rule, namely, that settlement of a personal injury claim by a corporation may, in the ordinary course of business, include a contract of life employment, recognize the so-called general rule applied in the *Murray* case under the facts the Court there found. They deny the applicability of the general rule to cases where the facts are like those in the case before us and explain why a different rule should there be applied. Some of the cases rely on the theory of apparent authority, some on the theory that a corporation which has received the benefits of a contract is properly and equitably estopped to deny the authority of the officer who made it. I think that the facts in this appeal justify invoking both theories. McNabb, as District Superintendent in Baltimore, was the company, as far as Ray was concerned. Ray was certainly justified, when he made the contract with McNabb, in thinking that he was making it with the company. The board of directors meant nothing to him and he would not be bound by by-laws or board resolutions in the absence of actual knowledge of them. *Restatement, Agency,* 167 b. McNabb, as District Superintendent, undoubtedly could make settlements of personal injuries which involved, in dollars and cents, far more money than would be represented by the settlement which was made with Ray. The facts which I think justify finding estoppel are referred to hereafter.

A leading case which supports the appellee is *F. S. Royster Guano Co. v. Hall,* (C. C. A. 4th) 68 F. 2d 533, 535 (referred to in the *Heckler* case). There the plaintiff lost his right arm, received in settlement $700.00 and was put back to work at the same rate of wages he had been receiving. The company official who dealt with him was one Baynard, the Superintendent of the Charlotte plant, and the contract, as found by the Court, was for the payment of the sum of $700.00 and a lifetime job for top wages for common labor. The Circuit Court of Appeals for the Fourth Circuit, speaking through Judge Parker, pointed out that the plaintiff surrendered,

for the small sum of $700.00, his claim of damages for the loss of an arm, and said: "The case is radically different, therefore, from one where nothing is given or surrendered in consideration of the promise of permanent employment. . . . The fair meaning of the promise was that defendant would furnish plaintiff employment so long as he might live at the highest rate of wages which it paid for common labor, with the implied provisos that he perform the work assigned him satisfactorily and that defendant continue in business." The Court pointed out that ordinarily, the general manager of a business does not have authority to enter into contracts for life employment, but quotes Judge McDermott in *General Paint Corp. v. Kramer,* (C. C. A. 10th) 57 F. 2d 698, 703, as follows: "We recognize that there are instances when such contracts are and should be upheld, as, for example, where, as an incident to a settlement for personal injuries, it is agreed to employ the injured one in some capacity not involving managerial responsibility." Judge Parker went on to testify to the wisdom of the rule as follows: "The wisdom of this exception to the general rule is manifest. Such contracts providing employment to laborers who have been injured in the service of the employer do not interfere in any substantial way with the employer's control over his business. They are reasonable, in that they enable the employer to obtain release from claims for damages which may prove expensive to him, while providing a livelihood to employees who have been injured in his service and who , because of such injury, may have difficulty in finding employment elsewhere. . . . It is to be noted that in the case at bar, the defendant, while denying the validity of the contract upon which the jury has found that the release was obtained, has pleaded that release, as well as the statute of limitations, in bar of plaintiff's right to recover for his injury. If these pleas should be sustained, and at the same time validly be denied to the contract of which defendant has thus

had the benefit, the injured employee would be without remedy."

Judge Parker, for the Court, found that it would be hard to imagine anyone whose authority to make it would be "more readily assumed than a superintendent in general charge of the plant where the injury was sustained", and said again, "but there is more here showing the authority of the superintendent with respect to this settlement than merely the general authority which usually pertains to that position. Someone made a settlement with plaintiff for his injuries and obtained a release. Plaintiff testified that it was the superintendent who did this; and, as stated above, the verdict of the jury must be interpreted as a finding that this was the fact. The defendant cannot accept the fruits of a settlement and then assert that the agent who made it had no authority to settle. We do not mean to say that acceptance and reliance upon a release is, in the absence of knowledge, a ratification of the settlement as made; but it is a recognition of some authority to settle in the one who has obtained it, and the question which remains is as to the extent of that authority. The question here, then, is narrowed to this: Whether, under the circumstances disclosed, the superintendent in charge of the local business of the defendant, whose authority to settle a claim for personal injuries has been recognized, was clothed with apparent authority to bind the employer by a contract of permanent employment as one of the terms of the settlement. We think that this question must be answered in the affirmative. For cases in which a similar result has been reached see........" (Citing cases).

As the Court found, to paraphrase Judge Parker, McNabb made a settlement with the plaintiff which included a job for life, in consideration of forbearance to sue, and the statute of limitations is now a complete protection to the company. I do not think that the appellant which has accepted the fruits of this settlement for twenty-five years can now assert that the agent

who made it had no authority to settle. It is impossible for me to believe that a reasonable man would not inevitably find from the facts proven that the company either knew or must be presumed to have known of the settlement. Ray's injuries were extremely serious. He suffered the loss of his right leg, a skull fracture, fractures of his left leg and right arm, and other injuries over practically his entire body. No money was paid in settlement of these very serious injuries; no suit was ever filed seeking any. This alone would put the company on notice. All the Pullman Company paid was the hospital expenses, amounting to some $1,040.00, and weekly sums while Ray was unable to work, of about $10.00 per week, or some $440.00. In addition, they purchased him an artificial leg, and thereafter, from time to time, three other artificial legs. All of this was done for an employee of no particular skill or value to the company who had worked for it only seven months before the injury. Yet, the District Superintendent in Baltimore promised this new employee a lifetime job. He worked as a diagram messenger for over twenty years. The duties of a diagram messenger are to meet the various trains and to take to, and receive from, the Pullman conductor the schedules of seat and berth occupancy. The Pullman Company officers, travelling over the system, inevitably over the years must have seen Willie Ray working as a diagram messenger, and the unusual spectacle of seeing a one-legged man in this capacity, which requires considerable walking, can scarcely have escaped their attention. The checks for the hospital expenses and the artificial legs must have come from, or to the attention of, the central accounting office and have been of such an unusual character as to promote inquiry for their necessity and propriety. There is uncontradicted testimony that on at least two occasions, McNabb told experienced employees of The Pullman Company that they had given Willie Ray a lifetime job and were lucky to have been able to effect settlement on that basis, and that it had saved the Company a great

deal of money. Such matter-of-fact comments to fellow workers indicate that McNabb had made the contract and that it was a matter of common knowledge in the Pullman Company, or at least, they furnish evidence from which the jury could have so found. Another significant fact is that when the work of diagram messenger was changed, Ray was given a job as stock keeper but retained on the payroll for four years as a diagram messenger. This unusual procedure must have also excited inquiry as to Ray's status, if any were needed by that time.

The case in some of these aspects may be said to be analogous to that of *Fisher v. John L. Roper Lumber Co.*, 183 N. C. 485, 111 S. E. 857, 859, 35 A. L. R. 1417 (cited by Judge Delaplaine for the Court in the *Murray* case). There the Court determined that the jury could properly find that the contract "was by way of compromise and adjustment of a *bona fide* claim on the part of plaintiff against the company. Such an adjustment will afford sufficient consideration for the agreement, whether the claim was well grounded or not." The contract was made by the defendant's foreman in charge of the mill in which the employee was injured and was to the effect that the company would employ the worker in such work as he could do about the mill in his crippled condition at a living wage for the balance of his life sufficient for himself and the support of his family. The Court pointed out that there was evidence "tending to show that the company paid for the operation amputating plaintiff's arm, and that the owner of the plant and the general superintendent both personally knew of the injury and the amputation, and that plaintiff was taken back into their employment at the same wages, notwithstanding the loss of his arm, and they knew, or should have known, the condition of his return and the agreement concerning his employment, assuredly they had every opportunity to know, and there were facts sufficient to excite inquiry as to the terms of his further employment. . . . It ap-

peared that this man, having only one arm, was on the employer's payroll at the price of a full hand for twelve years, and if the management didn't know of the terms of plaintiff's employment their negligence in this respect should be imputed to them for knowledge."

This Court has made plain its views on the acceptance of the benefits of a contract made by one who ordinarily would not have authority to make it, where the corporation knew or is presumed to have known, of what occurred. In *Edelhoff v. Horner-Miller Mfg. Co.*, 86 Md. 595, 39 A. 314, a chattel mortgage of corporate property was not shown to have been executed upon the express authority of the directors. The money obtained was used to pay the debts incurred by the corporation. The Court said: "Now while it may be true, as a general rule, that ministerial officers of a corporation without authority expressly conferred or to be implied from previous conduct, cannot pledge the property of the corporation, yet when a mortgage of its chattels has been made by such officers for the purpose of securing funds to pay its debts and continue its business, and it receives the full benefit of the transaction, without objection being made, it will be presumed to have authorized or ratified the acts of its officers." In *Webb v. Duvall*, 177 Md. 592, 11 A. 2d 446, the chattel mortgage was executed in the name of the corporation by the purchasing agent. The chairman of a creditors committee, designated to manage and operate the company's plant, purchased a printing press to be used in the business and paid for it with his own money. To secure himself, he prepared a chattel mortgage and had it signed by the company's purchasing agent. There were subsequent meetings of the officers and directors but at none of them was the mortgage mentioned and there was no corporate action giving authority to the purchasing agent, or anyone else, to execute the mortgage. It was conceded that the printing presses were used in the plant until the receivers were appointed. The Court decided that the mortgage was binding on the corpora-

tion, saying: "From the foregoing authorities, as applied to the facts in the instant case, it is our conclusion that there was that degree of *constructive* knowledge and *implied* ratification on the part of the corporation with reference to the purchase of the presses and equipment, and the execution of the chattel mortgage involved herein, to support the appellant's contention that his claim was a valid subsisting lien. . . ." (Emphasis supplied).

In *Usher v. New York Cent. & H. R. R. Co.*, 76 App. Div. 422, 78 N. Y. Supp. 508, 509, affirmed, 179 N. Y. 544, 71 N. E. 1141, the contract was for the employment of the plaintiff at a monthly compensation of $35 per month for life. The contract was entered into between the plaintiff and the superintendent of the Hudson River Division. The plaintiff had been injured while in the defendant's employ and had lost his leg, and the life contract was in part settlement of his claim. The Court said: "The main contention on the part of the appellant is that the contract, if made, was not binding upon the company, for the reason that the division superintendent had no power to make it in the absence of expressed authority, and that the contract was in itself unreasonable. . . . The transaction between Watson and the plaintiff was in effect but a single agreement by which the latter released his claim, and the former agreed to hire him for life in consideration of such release. To permit the defense now under consideration would relieve the defendant from all liability on a contract which the plaintiff fully performed when he relinquished his claim. A corporation, when sued, cannot set up *ultra vires* as a defense to an action for breach of contract, or even for specific performance, when it has had the full benefit of the contract, and the other party has duly performed it; nor will such a plea avail, whether interposed for or against a corporation, when it will not advance justice, but will accomplish a legal wrong." See also *The Pennsylvania Company v. Dolan*, 6 Ind. App. 109, 32 N. E. 802; and *Starr v. Superheater Co.*, (C. C. A. 7th) 102 F. 2d 170-176, where the Court referred to the *Usher*

and *Dolan* cases just cited, and said: "These holdings are based upon the equity rule that an employer cannot retain the advantage or benefit arising from the promise and at the same time deny the authority of the agent who made it. Application of this rule would scarcely be denied in any jurisdiction because it is based upon sound elements of estoppel." This case was referred to by Judge Delaplaine in the *Murray* case, and the language just quoted was adopted by this Court.

The Court, in the opinion in the present case, says that there are no facts to support a theory of estoppel. I feel that the facts which have been cited, as to the payment of Ray's hospital expenses and the cost of his artificial legs, his reemployment, and the running of the statute of limitations, the consequent bar to his claim, and the knowledge of the Company, actual or necessarily implied, are ample evidence of estoppel to bring the case within the rule of the cases cited. For cases where what I conceive to be the proper rule to be applied here, has either been applied or definitely recognized, see: *Eggers v. Armour & Co. of Del.*, (C. C. A. 8th) 129 F. 2d 729; *Toni v. Kingan & Co.*, 214 Ind. 611, 15 N. E. 2d 80; *Cox v. The Baltimore & Ohio Southwestern Railroad Co.*, 180 Ind. 495, 103 N. E. 337, 50 L. R. A., N. S., 453; *Hobbs v. Electric Light Co.*, 75 Mich. 550, 42 N. W. 965; *Stevens v. Southern Railway Company*, 187 N. C. 528, 122 S. E. 295; *Standard Oil Co. v. Nickerson*, 103 Fla. 701, 138 S. 55; *Okla. Portland Cement Co. v. Pollock*, 181 Okla. 266, 73 Pac. 2d 427; *Louisville & N. R. R. Co. v. Cox*, 145 Ky. 667, 141 S. W. 389; *Jackson v. Ill. Cent. R. Co.*, 76 Miss. 607, 24 S. 874; *Brighton v. Lake Shore & M. S. Ry. Co.*, 103 Mich. 420, 61 N. W. 550; *American Car & Foundry Company v. Smock*, 48 Ind. App. 359, 91 N. E. 749, 93 N. E. 78; *Illinois Central Railroad Company v. Fairchild*, 48 Ind. App. 300, 91 N. E. 836; *Stanton v. Erie R. Co.*, 131 N. Y. App. Div. 879, 116 N. Y. Supp. 375; and *Sax v. Detroit G. H. & M. Ry. Co.*, 125 Mich. 252, 84 N. W. 314.

If my view of the cases prevailed, it would be necessary to decide two other points which were argued: 1, that the promise of employment was also conditional upon there being work available which the appellee was competent to perform, and 2, that the contract for employment was modified to that extent by the collective bargaining agreement to which Ray was necessarily a party.

I think that there is abundant evidence from which the jury could find that there was work which the company could give Ray and which he was qualified to perform, which in no way would have come in conflict with the conditions of the bargaining agreement. Ray had seniority in Baltimore, he had worked as a stock keeper for four years and there was available, or could have been made available, the job of assistant stock keeper. I have no doubt that if Ray was qualified to perform the work he did perform for twenty-five years, the last four as stock keeper, he was qualified to perform work the company had available, or could have made available, to him without infringing, in any way, on the obligations it assumed under the collective bargaining agreement. I think the Court's instructions on this point to the jury were sound, and evidently the jury, from its verdict, agreed with this point of view. I would affirm the judgment..